## JACOB TOME *vs.* THE PARKERSBURG BRANCH RAILROAD COMPANY.

*Principal and Agent—Responsibility of Principal for the Fraudulent conduct of its Agent—Measure of Damages—Evidence—Opinions as to the genuineness of Signatures, founded upon a mere Comparison of Hand-writing, Inadmissible—Photographic copies of Signatures, with Explanations by the Photographer, and his Opinion based upon a Comparison of such copies, as to the Genuineness of the Signatures, inadmissible in Evidence.*

By the by-laws of a railroad company, its treasurer was made the custodian of the ledger and other books relating exclusively to the ownership and transfer of the capital stock of the company; he was required to prepare and countersign all certificates of ownership of stock and scrip that might be issued, and to receive and enter upon the proper books all transfers thereof. It was made his duty, also, to affix the seal of the company to all certificates of ownership of stock and scrip properly issued by the company, and signed by the President. Such treasurer, wishing to obtain money for his own use, fraudulently issued from the office of the company sundry certificates of stock, signed by himself, sealed with the corporate seal of the company, and having also the signature of the President, and purporting to be genuine in every respect. Upon the stock so issued, the treasurer through the agency of a broker, borrowed large sums of money, the lender not knowing for whom the money was wanted, and advancing the same solely upon the faith of the certificates, which he believed to be genuine. Two of the certificates were issued directly to the lender, and the third was issued to the broker and by him assigned to the lender. Some months afterward it was discovered that there had been a fraudulent issue of stock to a large amount by the treasurer, who soon after the discovery absconded. The company thereupon gave notice requesting the holders of its genuine stock to present their certificates and receive in exchange new certificates. Upon presentation of the above certificates by the holder thereof, in pursuance of this notice, he was informed that they were spurious, and the treasurer of the company refused to exchange them for new certificates. On suit

Tome *vs*. Parkersburg Branch R. R. Co.

brought against the company, by the holder of these certificates, for its refusal to exchange them for new certificates, it was HELD :

That the defendant was liable for the fraudulent acts of its agent; and the jury in assessing the damages to which the plaintiff was entitled, might allow him the amount of the money advanced on the stock with interest, or the amount of the market value of the stock at the date of the loan, with interest, (if they deemed it proper to allow interest) the amount allowed, however, not to exceed the amount of the money loaned with interest, if the value of the stock should be greater than the loan and interest.

Shortly after the discovery of the fraudulent conduct of the treasurer in the over-issue of stock, the directors of the company, on the 10th of August, 1870, held a meeting at which a report was made by the Finance Committee, setting out in detail the extent of such over-issue. In this report there was no mention made of one of the certificates held by the plaintiff. The plaintiff offered to read in evidence the record of the proceedings of this meeting, from the record book of proceedings of the company, having previously read, without objection, from the record of the various meetings of the stockholders and directors of the company, held prior to this meeting. The defendant objected to the admission of the proffered testimony. HELD :

That the proceedings of the meeting of the 10th of August, were admissible— the report of the Finance Committee that one of the certificates of stock held · by the plaintiff, did not appear upon the list of "over-issues of the stock of the company," furnishing the strongest negative proof that such certificate was genuine and not spurious.

On the question of the genuineness of the signature of a Mr. Van Winkle to certain certificates of stock sued on, a witness professing to be an expert in the matter of hand-writing, was offered to prove that the signature to such certificates, was not genuine. He stated that he had never seen Mr. Van Winkle write, nor received any letter from him, nor had he become acquainted with it in the course of business, but that his only knowledge on the subject was derived from an examination of the signatures of said Van Winkle, in the two certificate books in evidence, which had been placed in his hands by the defendant to enable him to testify, and that he had carefully examined them for five or six months, and had thus acquired a knowledge of the hand-writing of Van Winkle. HELD :

That the witness was not competent to testify as to the genuineness of Mr. Van Winkle's signature, his opinion being derived solely from a comparison of hand-writing.

On the same question, a photographer by profession and expert in hand-writing, offered as a witness by the defendant, stated that he had, at the instance of the defendant, made photographic copies of the signatures of Van Winkle to the certificates sued on, and of others admitted to be genuine—that some of these copies were of the actual size of the original, and others of an enlarged size. The defendant thereupon proposed to offer said copies in evidence, to be examined by the jury, together with explanations by the witness as to the differences between the genuine and those alleged to be forged, and his opinion, derived from a comparison of those copies, as to the genuineness of the signatures to the certificates sued on. The plaintiff objected. HELD.

That the proffered evidence was inadmissible.

APPEAL from the Superior Court of Baltimore City.

The nature of the case, together with the pleadings, are stated in the opinion of the Court. The appellant, the plaintiff below, on the 2nd October, 1869, loaned Thos. R. Rich & Co. $6650, on the security of 350 shares of the appellee's stock, on that day issued from its office, by John L. Crawford, the treasurer of the company, in the usual way, in the name of the plaintiff. On the 9th May, 1870, he renewed a loan on the same certificate for $6000, taking Rich & Co's obligation for its return on the 8th August, 1870. On the 8th or 9th of April, 1870, he made a like loan of $3300, upon a certificate of 200 shares of like stock, on that day, issued as before, in his name. This loan was afterwards reduced by payments to $3000, and on the 9th July, 1870, was renewed for that sum, upon the same certificate for 200 shares. Afterwards, the plaintiff demanding further security for the loan of $6000, a certificate for fifty shares was issued in his name and delivered to him on the 27th July, 1870. The plaintiff "made both of the loans upon the faith of the certificates of stock, and would not have made them on the personal responsibility of Rich & Co." Rich, who was examined as a witness for the plaintiff, stated that the principal in the transaction, for whom the money was

borrowed, was John L. Crawford, though he did not mention this fact at the time, to the plaintiff.   That Crawford never repaid him the money, so that he was unable to re-pay the plaintiff, and is now unable to pay his debts.   "That when he received these and other certificates of stock from Crawford they were usually taken from a book of certificates, in which there were certificates signed by Van Winkle, which book was taken from the safe, (there being only one safe in the office,) by Crawford, who would then put the seal of the company upon them and sign his own name to them, and then hand them to witness.   This was done openly in the office."

In August, 1870, the directors of the appellee for the first time discovered certain frauds of their treasurer and stock transfer agent, Crawford, extending back for some years; he was thereupon removed from his office, and absconded; and Louis McKim was appointed treasurer and transfer agent in his place.   The old office of the company was closed, and the transfer of stock of the company was suspended and disallowed until 30th December, 1870, when a notice was published that the transfer books of the company would be re-opened 3rd January, 1871, at the banking house of McKim & Co. in Baltimore.

Holders of the *genuine* stock were requested to present their certificates at that place, and receive in exchange the new certificates that had been prepared for them respectively.   In consequence of this notice the plaintiff called at the banking house of McKim & Co., presented his three certificates to Louis McKim, the treasurer, and asked for his new certificates in exchange.   McKim examined them, said the certificates were spurious, because they were over-issues, and he could not do anything with them.

Before the discovery of Crawford's alleged frauds the stock of the company had a market value of about $24 per share, afterwards at about $12 only.   The stock

which was repudiated by the company was rendered worthless. It had no market value at all. It was admitted by the defendant, that the company delivered to Crawford, as its treasurer and stock transfer agent, for the purposes of that office, three books of blank engraved certificates of stock. That one of the books had been used up in the regular business of the office, by the issuing of all the certificates therein; and that the second book, in August, 1870, was in process of being used for the same purpose, and was nearly exhausted. They were both offered in evidence. It was contended by the company, that the three certificates in suit, as well as others, which they repudiated as spurious, had been issued by Crawford out of the *third* book of blank certificates, which had been destroyed by him; and that the signatures of P. G. Van Winkle as president, upon all certificates taken from the *third* book, were forgeries. On the part of the plaintiff it was contended that the signatures in question were genuine, and proof to that effect was offered. It was also shown, that P. G. Van Winkle, the president, who did not reside in Baltimore, was in the habit of leaving his signatures upon blank certificates, in the books, to be filled up and countersigned by Crawford. It was further in evidence that the signatures of Van Winkle to the certificates in the *third* book, from which the spurious certificates were taken, were surreptitiously procured by Crawford. It was further shown, that Messrs. McKim and Garrett, directors in the company, had each loaned money to Crawford upon a certificate of stock, accepted as genuine, but since alleged by the defendant to be a forgery; and that Mr. Van Winkle, the president, himself had pronounced his signatures genuine, upon certificates held by the National Mechanics' Bank, which were afterwards repudiated by the company as forgeries.

It was also in evidence that Mr. Van Winkle, although informed by Mr. McKim as early as March, 1870, that a

great deal of money was being borrowed on the stock, and "that Crawford was operating in Parkersburg stock," he was contented to accept Crawford's statement "that all was right." On a subsequent occasion he was sent for to Hyde Park to come again and look into the matter, and he reported "that he had given Mr. Crawford's books a thorough examination, and had a free conversation with him, and was satisfied everything was right." Again he was called on to go with Mr. McKim to the Mechanics' Bank to examine two certificates held by that bank. Mr. Coleman, the cashier, told him that he had heard rumors of an over-issue of stock. Van Winkle said he had heard those rumors, asked to look at the two certificates, inspected them carefully for two or three minutes, handed them to Mr. McKim, who looked at them for a minute or two and handed them back to Van Winkle, who returned them to Coleman, saying, *"these are all right,"* remarking that it was his habit to leave certificates signed at the office, as it was impossible for him to be within reach at all times. These two certificates were shown at the trial *not* to have come out of the first or second book, and were repudiated by the defendant as *forgeries*.

*First Exception:* The plaintiff offered to prove by Josias Lee Johnston as follows:

I am a banker and broker; before August, 1870, I called Mr. Garrett's attention to the unusual quantity of Parkersburg stock on the market, and he said he would go to the Parkersburg Railroad office and look into it; he returned, and while I do not remember his exact answer, it was such as to re-assure my mind that all was right at the Parkersburg Branch Railroad office; I had already made a small loan on the stock, and I made two large loans afterwards; they were made on thirty days' call, and I called them in before August, 1870, but they were not all paid; I made the loans on March 26th, and

April 8th, 1870; those were the loans made after my conversation with Mr. Garrett; I never had a second conversation with Mr. Garrett before the difficulties became known.

On cross-examination, the witness said: The small loan was for $4500, the loan in March was for $10,000, and in April for $10,500: I took Mr. Crawford's note for each loan; I had my conversation with Mr. Garrett in February or March, 1870; I do not remember shewing him any certificates; I cannot remember whether he told me my certificates were right or the books of the company were right; I do not recollect why he said all was right; both interviews were at my office; I did not send for him, and the conversation was incidental; I don't think Mr Garrett has ever seen the two certificates upon which I made the loans; all was paid me except $2500; that was on the third loan of $10,000; Mr. Crawford paid the $10,500 loan on the 29th of July, 1870.

To the admissibility of this testimony the defendant objected, and the Court sustained the objection. The plaintiff thereupon excepted.

*Second Exception:* Waived.

*Third Exception:* The plaintiff offered to read in evidence from the record book of proceedings of the directors of the defendant, of the 10th of August, 1870. The defendant objected and the Court sustained the objection. The plaintiff excepted.

*Fourth Exception:* The defendant offered in evidence by Joseph E. Paine, that he was an expert in the matter of hand-writing, and that he believed the signatures, P. G. Van Winkle, in the certificates sued upon in this case, were not genuine signatures. The defendant then offered to ask the said Joseph E. Paine, as a witness familiar with the hand-writing of P. G. Van Winkle, whether from his knowledge of the hand-writing of said Van Winkle, he believed the said signatures to be in his

hand-writing; the witness being then interrogated as to his knowledge of Van Winkle's hand-writing, stated that he had never seen him write, nor received any letter from him, nor in the course of his business had he become acquainted with it; that his only knowledge on that subject was derived from an examination of the signatures of said Van Winkle in the two certificate books in evidence, which had been put in his hands by the defendant for the purpose of enabling him to testify in this case, and that he had carefully examined them for five or six months, and had thus acquired a knowledge of the hand-writing of Van Winkle; the plaintiff then objected to his competency as a witness to testify to the signatures on the certificates in suit in this case, as a witness having knowledge of the hand-writing of Van Winkle; which objection the Court overruled, and permitted the witness to give his opinion to the jury from his knowledge of the hand-writing of Van Winkle, that the signature of P. G. Van Winkle, upon the certificates in suit, were not his; to the overruling of his objection by the Court, and to the permitting the witness to give his opinion to the jury, the plaintiff excepted.

*Fifth Exception:* The defendant then offered evidence by Mr. Southworth, a resident of Charlestown, Massachusetts, that he was a photographer by profession, and also an expert in the matter of hand-writing; that he had been employed by the defendant to make photographic copies of the signatures, P. G. Van Winkle, attached to the certificate sued upon in this case, and also other certificates held by Alex. Brown & Sons, The National Mechanics' Bank of Baltimore, and others, the authority of which was disputed by the defendant; and also photographic copies of the signature P. G. Van Winkle, to a number of the certificates in the two certificate books in evidence, which the defendant claimed to be genuine signatures of said P. G. Van Winkle; and that

he had made such photographic copies not only of the actual size of the said signatures, but also by a magnifying process had produced the same of a very large size; and the witness then produced the said photographic copies, both of the actual and magnified size of said signatures, and the defendant thereupon proposed to offer said copies in evidence, to be examined by the jury, and also to examine the witness in reference to the same, that he might explain to the jury the differences between the photographic copies of the signatures which the defendant claimed to be genuine, and such as it claimed to be forgeries, and to express his opinion, derived from a comparison of those copies, as to the genuineness of the signatures of P. G. Van Winkle upon the original certificates sued upon in this case; the plaintiff thereupon objected to the offering of said copies in evidence to be examined by the jury, and to the examination of the witness in reference thereto ; but the Court overruled his objections and permitted said photographic copies to go to the jury as evidence, and also permitted the witness to be examined in reference thereto. ·The plaintiff thereupon excepted.

*Sixth Exception:* The plaintiff offered the following prayers:

1. If the jury believe from the evidence that the plaintiff, on the 9th day of May, 1870, loaned and advanced the sum of $6650, and on the 9th July, 1870, the sum of $3000, on the faith of the three certificates of stock of the defendant, now held ·by the plaintiff, and obtained by him from Rich in the manner shewn by the evidence in the case, and that said certificates were issued from the office of said defendant by its transfer agent, while engaged in the business of his employment as such transfer agent, and that said certificates were signed by the president and treasurer of said defendant, and sealed with its seal, and were in all other respects in the usual

form of genuine stock certificates of the said defendant; and shall further find that the defendant, in the month of January, 1871, notified all holders of its stock certificates to present them at the banking house of McKim & Co., in Baltimore city, for the purpose of having them exchanged for new certificates of a different design, and that the plaintiff, upon the presentation of his certificates at the banking house aforesaid, was informed by the treasurer and transfer agent of the defendant acting under and by its authority and direction, that said certificates of stock were spurious and void, and shall find that the defendant repudiated and refused to recognize the same; and shall further find that the party from whom the plaintiff received said stock, and to whom the plaintiff made the loans and advances aforesaid, on the security of said stock, has not paid the same or any part thereof, and is utterly insolvent, then the plaintiff is entitled to recover in this action.

2. If the jury believe from the evidence that the plaintiff, on the 9th day of May, 1870, loaned and advanced the sum of $6650, and on the the 9th July, 1870, the sum of $3000, on the faith of the three certificates of stock of the defendant, now held by the plaintiff, and obtained by him from Rich in the manner shewn by the evidence in the case, and that said certificates were issued from the office of the said defendant by its transfer agent, while engaged in the business of his employment as such transfer agent, and that said certificates were signed by the treasurer of the said defendant, and sealed with its corporate seal, and purported to be signed by the president of the defendant, and were in all other respects in the usual form of genuine stock certificates of the said defendant; and shall further find that the office from which said certificates were issued, was the regular stock transfer office of the defendant, and that the said transfer agent was authorized to issue all the stock certificates of

the defendant from that office, signed by himself as treasurer, and by the president of said defendant, and sealed with its corporate seal, upon engraved certificates, such as were used by him in this case; and shall further find, that at the time of the receipt of said certificates the plaintiff believed them to be genuine, and had no suspicion, and no ground for suspicion, that they were in any respect spurious, then the defendant is bound, by the representation of the validity and genuineness of said certificates of stock, so made by the act of its said transfer agent in the premises, and is estopped from denying the validity and genuineness thereof; therefore, if the jury further find that the defendant, in the month of January, 1871, notified all holders of its stock certificates to present them at the banking house of McKim & Co., in Baltimore city, for the purpose of having them exchanged for the new certificates of a different design, and that the plaintiff, upon the presentation of his three certificates at the banking house aforesaid, was informed by the treasurer and transfer agent of the defendant, acting under and by its authority and direction, that said certificates of stock were spurious and void; and shall find that the defendant repudiated and refused to recognize the same; and shall further find that the party from whom the plaintiff received said stock, and to whom the plaintiff made the loans and advances aforesaid, on the security of said stock, has not paid the same or any part thereof, and are utterly insolvent, then the plaintiff is entitled to recover in this action.

3. Even if the jury should find that the signatures of Van Winkle, to the three certificates in controversy in this suit, are not genuine, still, if they should also find that said signatures were forged by Crawford, and that Crawford was the transfer agent and treasurer of the defendant, and that said certificates were issued by him from the defendant's transfer office, under the genuine seal

of the defendant, and his, Crawford's genuine signature as treasurer, in the apparent performance and discharge of his official duties and business as such transfer agent, and that said certificates were taken by the plaintiff, and money advanced upon them by him, without knowledge of any fraud, and without suspicion, or ground for suspicion, that said certificates were not genuine, then the fact of said forgery of the signatures of Van Winkle does not constitute a defence to the defendant's liability in this suit.

4. If the jury believe from the evidence, that the certificates of stock held by the plaintiff were issued by Crawford, from the transfer office of the defendant, in the business of his employment as its transfer agent, and that they were received by the plaintiff in good faith, as collateral security for loans made upon them in the manner disclosed by the evidence, and that at the time of the receipt of said certificates, and the making of said loans, the plaintiff had no suspicion, and no reasonable ground for suspicion, that said certificates were spurious; and shall further find that said certificates were fraudulently issued by Crawford, without the genuine signatures of the president of said defendant, out of a certificate book delivered to him as treasurer and transfer agent of the defendant, at the time of his appointment, and that they were signed by him as treasurer, and sealed by him with the corporate seal of the defendant, which had been placed in his custody by the president; and shall further find that Crawford was enabled to perpetrate this fraud by reason of the negligence of the president and directors of the defendant, and their failure to exercise reasonable and proper care, skill and diligence in reference to the acts and proceedings of the said Crawford as such transfer agent of the defendant; and shall further find that the party to whom said loans were made on said stock, has never paid the same or any part thereof, and

is utterly insolvent, and that the defendant, in the month of January, 1871, repudiated said stock certificates, and declared them to be spurious and void, then the plaintiff is entitled to recover in this action.

5. If the jury find that the plaintiff is entitled to recover under any one of the instructions given by the Court, then, if they shall further find that there were issued by Crawford, the said transfer agent of the defendant, from its office, in the business of his said employment, and in the apparent performance of his duties as such agent, certificates of the stock of the defendant, sealed with its seal, signed by its treasurer, and signed or purporting to be signed by its president, amounting in the whole, including the three certificates held by the plaintiff and offered in evidence, to about 25,000 shares, and that they were issued by said agent fraudulently, and were over and above the shares of the capital stock of the defendant authorized to be issued by its board of directors, and that the value of the stock of the defendant was depreciated in the market by reason of such fraudulent over-issue of its stock, then, in assessing the damages of the plaintiff, the jury are not to consider such depreciation, but should give to the plaintiff, as damages, a sum equal to the amounts loaned by them, with interest, if the jury should think proper to give interest; provided such sum does not exceed the market value of the stock at the time of the loans, and if they find that its subsequent depreciation was owing entirely to such fraudulent issue.

This prayer was rejected as offered, but granted with a modification, which consisted in striking out all after the word "jury" in the eighteenth line, and substituting in its stead the following: *will give him the sum lent by him with interest, if the jury shall think proper to give him interest, or so much of said sum and interest as they may find to have been the value of the stock, under all the circumstances, at the date of the loan by him.*

6. If the jury shall find from the evidence, that early in March, of the year 1870, the attention of Mr. Garrett, one of the directors of the defendant, was called to the fact that public rumors existed in regard to over-issue of the defendant's stock, and that in consequence thereof he undertook to make a special examination of the case of Messrs. Johnston Bros., and went to the transfer office of the defendant, to see whether their stock was regularly entered in the books of the company, and returned to Messrs. Johnston Bros., and informed them that it was all right; and shall further find that Mr. Garrett also, at the same time, examined into the regularity of issues of stock to his house, and reported that he found them all regular; and shall further find, that early in the month of June, 1870, the attention of Messrs. Garrett and McKim, directors of the defendant, was again called to the fact of rumors in regard to over-issues of the defendant's stock, and that the president of the company, Mr. Van Winkle, was requested by them to make an examination of the books of the defendant in reference to two certificates of the defendant's stock, then held by the Mechanics' National Bank of Baltimore, and that he reported those certificates to be all right; and shall further find that the certificates so held by the Messrs. Johnston Brothers, and the Mechanics' National Bank, did not appear to have been issued out of the regular certificate book of the defendant, nor to have been entered either upon the stock transfer book or stock ledger of the defendant, and that it also appeared from the books that some of the stock of Mr. Garrett's house had also been fraudulently issued, and that the declarations of Messrs. Garrett and Van Winkle to the contrary were publicly and notoriously made ; and shall further find that the said examinations made by Messrs. Garrett and Van Winkle were partial and imperfect, and that the reports so made by them were incorrect, and that the loans and advances upon

the stock, made by the plaintiff, as offered in evidence, were made, all of them, after the report of Garrett, and some of them after the report of Van Winkle, then the said facts, in connection with all the other evidence in the case, are evidence to go to the jury upon the question of negligence raised by the plaintiff's fourth prayer.

7. If the jury shall find from the evidence that Van Winkle, the president of the defendant, was in the habit of signing his name as president to numerous stock certificates of the company, either in the certificate books, or when cut from those books, and leaving them so signed with Crawford, the treasurer and stock transfer agent of the company, to be countersigned by him as treasurer, and sealed with the seal of the company, and issued by him as the regular business of the company should require; and shall further find that the plaintiff's three certificates offered in evidence were among those so signed by the president, and that they were countersigned by Crawford and sealed with the company's seal, and issued by him, and received by the plaintiff in the manner disclosed by the evidence, without any suspicion, or any grounds whatever for suspicion, that the same were not issued in the regular and legitimate performance of Crawford's duties as stock transfer agent of the company, then the defendant is responsible to the plaintiff for the loss to him, arising immediately and directly from the repudiation of those three stock certificates by the defendant.

8. In reference to the first, second and third prayers of the defendant, now granted by the Court, the plaintiff asks an instruction to the jury, that if they shall find from the evidence that the plaintiff's certificates were issued by Crawford, the treasurer and stock transfer agent of the defendant at the transfer office of the company, and that they were signed by the President of the

company, and by Crawford as its treasurer, and sealed with the seal of the company, and were, in all respects, upon their face, genuine stock certificates of the company, then the burden of proof is upon the defendant to satisfy the jury that the issuing by Crawford of said certificates was without authority and a fraud upon the defendant, and that they were issued by Crawford for his own use and benefit, and not for the use and benefit of the defendant.

And the defendant offered the following prayers:

1. That although the jury may find the signature of Van Winkle, to each one of the certificates sued upon, is his signature, and although at the time of making said signatures, he was the president of the defendant, the plaintiff is not entitled to recover, if the jury shall find that the said certificates were severally issued by John L. Crawford, the treasurer of the company, fraudulently and surreptitiously, for his own use and benefit, and not for the use and benefit of the defendant.

2. That the plaintiff is not entitled to recover if the jury find the fact stated in the first prayer, because, as between the said Crawford and the defendant, the issuing by him of the said certificates was without authority and a fraud upon the defendant, and the plaintiff claiming the said certificates under the title of the said Crawford, by way of pledge or bailment, has no other title to the same than the said Crawford had at the time of said pledge or bailment.

3. That the plaintiff is not entitled to recover, although the jury may find that the said certificates were signed in blank by the said Van Winkle, and left with the said Crawford, to be lawfully used for and on account of the defendant; if the jury shall find that they were not so used, but were deposited by his agent, with his authority, as a security for the amount borrowed of the plaintiff for the said Crawford, by said Rich, his agent, and that the

said amount was in fact used for his benefit, and not for the use and benefit of the defendant.

4. That the plaintiff is not entitled to recover on account of said certificates, if the jury shall find that they were not severally signed by said Van Winkle as president of the defendants, and that said defendants are not estopped from denying the genuineness of said signatures.

5. That the defendants are not responsible to the plaintiff for or on account of said certificates, on the grounds of alleged negligence on the part of said defendants, or of its president, Van Winkle, or of any of its directors.

6. That if the jury believed the evidence in the case, they must find the facts stated in the defendants' first and second prayers, there being no evidence in the case that such facts are not true, and their verdict must be for the defendants.

7. That if the jury find that the certificates of stock in suit were issued by Crawford for his own benefit, and were used for such benefit, and not for the use and benefit of the company, and that the company have received no benefit therefrom, the company is not responsible for said certificates, because in so issuing and using said certificates Crawford committed a criminal offence, as well as a fraud, and their verdict must be for the defendant.

The Court (DOBBIN, J.,) granted the first, second, third, fourth, fifth and seventh prayers of the defendant, and rejected its sixth prayer, and granted the fifth prayer of the plaintiff with a modification, and also his eighth prayer, which was conceded by the defendant, and rejected the first, second, third, fourth, sixth and seventh prayers of the plaintiff as also his fifth as offered; to the refusal of the Court to grant his first, second, third, fourth, fifth, sixth and seventh prayers, and to the modification by it of his fifth prayer, and to the grant-

ing by the Court of defendant's first, second, third, fourth, fifth and seventh prayers, the plaintiff excepted. And the judgment being against him, he appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, MILLER and ALVEY, J.

*Samuel Snowden, Wm. F. Frick and I. Nevett Steele,* for the appellant.

It seems to be settled, that in order to make a witness competent to prove the genuineness of a signature, he should have seen the party write, or should have had correspondence with him, or should have seen letters, bills or other documents, purporting to be in his hand-writing, having afterwards personally communicated with him respecting them, or acted upon them with his knowledge and acquiescence ; or known that the party himself has acted upon them in the ordinary business transactions of life, so as to induce a reasonable presumption of their being his—the identity of the party, where personally unknown to the witness, to be proved in every case *aliunde. Smith vs. Walton,* 8 *Gill,* 81 ; *Edelen vs. Gough,* 8 *Gill,* 89 ; 1 *Greenleaf's Evidence, (Redfield,) sec.* 577.

The witness Paine was not competent, under any of these rules. His being allowed to testify was a palpable violation of the rule laid down in *Smith vs. Walton,* 8 *Gill,* 81, against comparison of hand-writing. The same was attempted in *Doe dem. Mudd vs. Suckermore,* 5 *A. & E.,* 703 ; *Goldsmith vs. Bane,* 3 *Halst.,* 87 ; *Thaicher vs. Goff,* 11 *Lou. R.,* 94, 98.

When the original signatures can be produced, the photographic copies of such signatures are not competent evidence. *Taylor Will Case,* 10 *Abb. Pr., (N. S.,)* 301. The only effect of such evidence would be to confuse the jury, and instead of trying the question of the genuine-

ness of the signatures upon the instruments sued upon, the jury might be led to believe that they were trying the question whether or not the photographic copies were correct and properly taken ; as that must necessarily be a question in reference to them.

A principal is responsible for the frauds, deceits, negligences, omissions of duty, and abuse of authority, of his agent, committed by such agent in the course, and within the scope, of his employment. *Penn., Del. & Md. S. Nav. Co. vs. Hungerford,* 6 *G. & J.,* 291, 297 ; *Phila., Wil. & Balt. R. R. vs. Quigley,* 21 *How.,* 207 ; *Phil. & R. R. R. vs. Derby,* 14 *How.,* 468; *Locke vs. Stearns, &c.,* 3 *Met.,* 363 ; *Smith's Mer. Law,* 147 ; *Dunlop's Paley,* 301 ; *Story on Agency, sects.* 308 *and* 452.

Corporations are as much bound by the acts of their agents as natural persons ; and when such agent is clothed with a certain power, he may use that power for an unauthorized, or even a prohibited, purpose in his dealing with an innocent third party, and yet render the corporation liable for his acts. *Redfield on Cor.,* 519; *Angell & Ames on Corp.; sec.* 315 ; *M. & I. R. R. Co. vs. Norwich Saving Society,* 24 *Ind.,* 462; *Ranger vs. The Great Western Railway Co., et al.,* 5 *H. of L. Cases,* 85.

And the real test of liability is, whether the act is done in the course of, and within the scope of, the employment. *Coleman vs. Riches,* 16 *C. B.,* 117; *Olding vs. Smith,* 11 *Eng. L. & E.,* 424; *Story on Agency, sec.* 456.

And it makes no difference whether the principal gets the benefit of the act or not; he is, nevertheless, bound to third parties. *Grammar vs. Nixon,* 1 *Str.,* 653 ; *Thompson vs. Bell,* 25 *Eng. Law & Eq.,* 171 ; *Williams vs. Mitchell,* 17 *Mass.,* 98 ; *City Bank of New Haven vs. Perkins,* 4 *Bosw.,* 420.

And if the act is within the scope of his employment, and yet unauthorized, even if it be wilful, the principal

is bound. *Green vs. London Gen. O. Co.*, 97 *Eng. C. L.*, 300; *Weed vs. Panama R. R. Co.*, 17 *N. Y.*, 362.

And when the very act done is authorized by the terms of the power, such act is binding upon the principal as to all persons dealing in good faith with the agent. Such persons are not bound to enquire into facts *aliunde.* The apparent authority is the real authority. *Pickering vs. Busk*, 15 *East*, 42; *North River Bk. vs. Aymar*, 3 *Hill*, 262; *Far. & Mec. Bk. vs. Butchers & Drov. Bk.*, 16 *N. Y.*, 125, 143; *Barwick vs. Eng. Joint Stock Bk.*, *L. R.*, 2 *Exch.*, 265; *Smith vs. Bd. of Water Coms.*, 38 *Conn.*, 217.

And where the agent has acted within the scope of his employment, the principal must suffer the loss rather than a third party, who has dealt with the agent in good faith; upon the ground, that of two innocent persons, he shall suffer who has put it in the power of another party to do an injury. *Clark vs. Met. Bank*, 3 *Duer*, 241; *Medbury vs. N. Y. & E. R. R.*, 26 *Barb.*, 564; *Westfield Bank vs. Cornen*, 37 *N. Y.*, 320; *Fitzherbert vs. Mather*, 1 *T. R.*, 12; *Herbert vs. Huie*, 1 *Ala.*, 18, 20; *Bk. of U. S. vs. Davis*, 2 *Hill*, 451, 461; *Merchants' Bank vs. State Bank*, 10 *Wallace*, 649.

The issuing of the certificates sued on was the lawful exercise of a power vested in Crawford by the appellee. It was an act which as a corporation it had full power to do; and whatever it could do in relation thereto, could be performed by its agent whom it held out as competent and fit to be trusted in that particular matter; and thereby in effect it warranted his fidelity and good conduct in all matters of the agency. *Bank of Kentucky vs. Schuylkill Bank*, 1 *Pars. Select Cases*, 180.

Acting thus within the scope of the authority vested in him as its sole transfer agent, if Crawford committed a fraud, either by issuing unauthorized stock certificates, to which were affixed the genuine signature of the presi-

dent, or by issuing such certificates to which he forged that name, third parties in dealing with him in good faith, were not bound to enquire into facts *aliunde*, but had a right to rely upon the exercise by Crawford of the apparent authority with which he was vested. And if he exercised that power for an unlawful purpose, the act being within the scope of his authority, the company must be held responsible for it. This is not the case of the doing of an act by the agent *outside* of the scope of his employment, in which, in order to make the company responsible, it is necessary to show an express subsequent ratification of the act, or that the company took the benefit of it. *Vide Phila., Wilm. & Balt. R. R. Co. vs. Quigley,* 21 *Howard,* 207; *Goff vs. Great N. R. R.,* 107 *E. C. L.,* 671; *Porter vs. N. Y. Cen. R. R. Co,* 34 *Barb.,* 353; *Atlantic Bank vs. Merchants' Bank,* 10 *Gray,* 532.

A corporation is liable for the act of its agents in making transfers of stock under a forged assignment or power of attorney. *Davis vs. Bank of England,* 2 *Bing.,* 293; *Chew and Goldsborough vs. Bank of Baltimore,* 14 *Md.,* 299; *Mayor, &c. of Balto. vs. Norman,* 4 *Md.,* 352.

When the agent of a corporation, whose duty and business it is to issue or transfer the stock of the corporation, fraudulently issues such stock for his own benefit, the corporation is liable for his acts, and must compensate the holders of such spurious certificates. *Bank of Kentucky vs. Schuylkill Bank,* 1 *Parson Sel. Cases,* 180, (248;) *N. Y. & N. H. R. R. vs. Schuyler,* 34 *N. Y.,* 30, (61 *to* 78;) *Case of J. K. Hasinger,* 2 *Ashm.,* 287; *Mechanics' Bank vs. N. Y. & N. H. R. R. Co.,* 4 *Duer,* 480; *Bruff vs. Mali,* 36 *N. Y.,* 200; *N Y. & N. H. R. R. vs. Schuyler, et al.,* 38 *Barb.,* 534.

The case of the *Mechanics' Bank vs. N. Y. & N. H. R. R.,* in 4 *Duer,* 480, which is similar to this case in the form of action, was reversed by the Court of

Appeals, in 13 *New York*, upon the theory that the case of the *North River Bank vs. Aymar*, in 3 *Hill*, 262, had been reversed, but this has been since shown to have been a mistake of the Judge, who delivered the opinion, and the authority of the case, in 3 *Hill*, has been fully vindicated and re-established, and therefore the case in 4 *Duer*, is now the law of New York. *Farmers' Bank vs. B. & D. Bank*, 16 *N. Y.*, 135; *Griswold vs. Haven*, 25 *N. Y.*, 602; *Exchange Bank vs. Monteath*, 26 *N. Y.*, 509; *N. Y. & N. H. R. R. vs. Schuyler*, 34 *N. Y.*, 30; *Westfield Bank vs. Cornen*, 37 *N. Y.*, 320.

The appellee is responsible to the appellant for the amount which he has lost through the act of its agent, whether the certificates of stock, upon which the loans were made, have the genuine signature of the president thereto, or whether his signature is forged, or whether the money went into the treasury of the appellee or into the pockets of Crawford, its treasurer, and therefore, the first and third prayers of the appellant should have been granted, and the first and seventh prayers of the appellee should have been rejected.

The acts of Crawford in issuing the certificates of stock, whereby the appellant was injured, being such as he was authorized to perform, and as he was in the habit of performing, as the duly appointed agent of the appellee for that purpose, and having been performed by him while engaged in the business of his employment as transfer agent, are in fact the act of the corporation itself; and each certificate being itself correct as to the form thereof, and under the seal of the appellee, and issued from its only office in Baltimore city, signed by the treasurer, and purporting to be signed by the president was a representation of the truth of the facts appearing upon the face of the certificate; and the appellee is therefore estopped from denying its validity. *Mechanics' Bank vs. N. Y. & N. H. R. R.*, 4 *Duer*, 480;

*Farmers and Mechanics' Bank of Kent Co. vs. Butchers and Drovers' Bank*, 16 *N. Y.*, 131.

The issuing of the certificate being a power which is given to the appellee for its benefit, the face of the certificate is a declaration and representation by the company to all the world that the party to whom it is given is a stockholder in the company, and is the owner of the number of shares stated in the certificate. It is given by the company with the intention that it shall be so used; and a third party taking such a certificate from it in good faith, and without any suspicion of fraud, has a right to rely upon the representation made in and by such certificate, and to presume that all the prerequisites to issuing of the certificate have been fully complied with. *Royal Br. Bank vs. Turquand*, 6 *E. & B.*, 327; *Supervisors vs. Schenck*, 5 *Wall.*, 784; *Gelpcke vs. Dubuque*, 1 *Wall.*, 203.

And the corporation cannot set up the fraud of its own agent as a defence to an action for damages upon a certificate so issued; because the act of the agent, is it *own* act, and such a defence would be relying upon its own fraud. *Merchants' Bank vs. State Bank*, 10 *Wall.*, 644; *Fay vs. Noble*, 12 *Cush.*, 1, [17;] *In re Bahia and San Francisco Railway Co. vs. S. F. R. Co.*, (*L. R.*,) 3 *Q. B.*, 594; *Webb vs. Commissioners, &c.*, (*L. R.*,) 5 *Q. B.*, 641; *Ward vs. South East R. Co.*, (105 *Eng. Com. Law*,) 2 *E. & E.*, 823; *N. Y. & N. H. R. R. Co. vs. Schuyler*, 34 *N. Y.*, 30, 61, 73, 74; *Herman on Estoppel*, sects. 389 *and* 538; *Laurenson vs. State*, 7 *H. & J.*, 343.

It was the appellee's duty alike to its stockholders and the public, to see that the business of transferring shares was conducted in accordance with its regulations. By appointing one of its own officers to take personal charge of and superintend that branch of its business, it represented him and his official acts to the public as entitled to full credit; and it undertook therefore to be responsi-

ble for such acts to those who might act on that credit in the customary mode of doing business.

The appellant in this case does not seek to recover upon the ground of the fraud of the appellee's agent; but upon the ground that the act of Crawford in issuing the stock of the defendant, upon which the appellant advanced his money, was the corporate act of the appellee, and that it is precluded from denying it to be its act, although Crawford may have acted fraudulently in transacting the business of the appellee. By reason of the representation made on the face of the three certificates of the stock of the appellee, that the appellant was the owner of the number of shares of stock set forth on the face of these certificates, the appellant was induced to loan his money upon the collateral security of that stock ; and it is contrary to public policy and a violation of good faith that the appellee should be permitted to repudiate its representations so made, and thus defraud the plaintiff out of his money. The representations so made by it, whether true or false, must be held conclusive against it. *Alexander vs. Walter*, 8 *Gill*, 247 ; *McClellan and Wife vs. Kennedy, et al.*, 8 *Md.*, 230.

For, if while acting in the business confided to him, Crawford was false to his trust, or wronged the appellee, the appellant, who acted in good faith, ought not to suffer thereby. *King vs. Pearce*, 40 *Mo.*, 222.

If this point be well taken, the second prayer of the appellant should have been granted, and the fourth prayer of the appellee should have been refused.

*Charles J. M. Gwinn, J. H. B. Latrobe* and *Reverdy Johnson*, for the appellee.

The questions involved in this case, may be discussed under the following heads :

First.—No recovery can be had, under any circumstances, on the certificates offered in evidence, without

proof of the genuineness of the signatures of the president and treasurer, and of the seal of the company; and the burden of proof here is upon the plaintiff.

*Second.*—No recovery can be had, even if the certificates were genuine as regards the seal and signatures, and in other respects, if.they were issued by Crawford for his own benefit, without authority; and there is nothing in the evidence to estop the defendants below from setting up a want of authority.

*Third.*—If the said certificates gave to Crawford no right which he could enforce against the company, the hypothecation of them to the plaintiff below, his bailee, could confer no rights which he did not possess himself.

*First.*—That the genuineness of the signatures is essential to the validity of the certificate would seem to be a self-evident proposition.

The signature of the two officers is for the security of the public as well as of the company. If the treasurer can write the president's name, the by-law requiring the president to write his own name is a nullity, which is not pretended. The charter authorizes the making of by-laws, which then become a part of the charter, and any other provision of the instrument may be as well neglected as that which, on the adoption of the by-laws, requires the double signature. *Presby. Ch. vs. Mayor, &c. of N. Y.,* 5 *Cowen,* 538; *McDermott vs. Bd. of Police, &c.,* 5 *Abb. Pr.,* 422.

So with regard to the seal. It not only gives a technical character to the certificate, but it is an additional guaranty to the public of the validity of the instrument.

*Second.*—Crawford exceeded his authority, even supposing the signatures and seal of the certificates to be genuine, in issuing the certificates for his own use; and the defendants below were not estopped from availing themselves of this defence.

Reference to the by-laws shews that the duties of Crawford were those of a transfer clerk only. The stock

Tome *vs.* Parkersburg Branch R. R. Co.

ledger and the transfer book, with the books containing the blank certificate, were all that in point of fact he had anything to do with, inasmuch as the entire working of the road was in the hands of the Baltimore and Ohio Railroad Company. His duty was to keep the stock account, and furnish evidences of the ownership.

From the evidence in the record, it appears that Crawford, instead of limiting himself to the transfer of existing stock, in his dealings, through Rich, with the plaintiff below, undertook to create new stock—not for the benefit of the principal, but of the agent—Crawford himself.

Can an officer of a corporation exceed the limits of his authority and bind the corporation by forgery or fraud, provided he can, in so doing, manage to avoid exciting the suspicion of the party with whom he is dealing? The general rule of law is, that every man dealing with the agent of a corporation, or individual, takes upon himself the duty and risk of determining the extent of the authority of such agent. *Pole vs. Leask,* 9 *Jurist, N. S.,* 829 ; *Adams Express Co. vs. Trego,* 35 *Md.,* 66.

This rule applies even more strictly to the case of corporations, than to the case of individuals, because the agency of the servants of a corporation, is, of necessity, limited by the nature of the business of the particular corporation, and by the charter and by-laws which form its rules and system of government.

In order, therefore, that a corporation should be bound by the act of its agent, the act sought to be enforced must be within the ordinary powers of such agent. This is the rule of the Roman and of the Common Law. It must be an act done for the company, and not for the individual benefit of the agent. *McGowan & Co. (limited) vs. Dyer,* 21 *Weekly Reporter, No.* 27, *May 3rd,* 1873 ; *Adams Express Co. vs. Trego,* 35 *Md.,* 67; *Barwick vs. English Joint Stock Bank,* 3 *L. R. Exch.,* 262 ; and must

be such an act as the corporation has in some way practically asserted that the agent has the power to do. It must, therefore, be a genuine act, attended with all the genuine forms by which such acts have been previously surrounded. It must not be a forgery, or fraud; for such services are not within the ordinary duty of an agent, nor can it be supposed that the corporation ever sanctioned them.

It has been held in many cases that a corporation is not liable for the frauds, or misrepresentations of its agents. *In re The North of England Joint Stock Banking Co., Dodgson's Case*, 3 *De G. & Sm.*, 85; *In re The North of England Joint Stock Banking Co., Bernard's Case*, 5 *De G. & Sm.*, 283; *In re Hull & London Life Assurance Co., Gibson's Case*, 2 *De G. & J.*, 283; *In re The Royal British Bank, Mixer's Case*, 4 *De G. & J.*, 575; *Udell vs. Atherton*, 7 *Hurl. & Norm.*, 186, 191, 195, 197.

In the case of *Henning vs. New York and New Haven R. R. Co.*, 9 *Bosworth*, 289, the Court say: "The language of the prevailing opinion is 'the power of the agent to charge his principal, by doing a wrong, must be traced distinctly to his authority, and *cannot be referred to an increased facility for imposing on the credulity of others, derived incidentally from his appointment to a situation of trust.*'" And again: "The same reasoning must apply to the possession of the transfer books; and an authority of the transfer agent to permit a transfer, accompanied with such possession, does not amount to such *indicia* of authority to certify to ownership of stock, as to fix a liability upon the defendants." 9 *Bosworth*, 290; see also *Mechanics' Bank vs. New York and New Haven R. R.*, 3 *Kern.*, 632–638; *Foster vs. Essex Bank*, 17 *Mass.*, 479; *Fuller vs. Wilson*, 3 *Ad. & Ellis*, *N. S.*, 58; *Story on Agency*, 305.

Are the defendants estopped by the circumstances of the case from availing themselves of the defence that

their agent, exceeded his authority? What are those circumstances? The appellant replies the negligence of the directors in leaving the means of committing the fraud in the hands of Crawford, to wit, the seal, the blank certificates, and the facilities afforded by the position of Crawford in the transfer office of the company in Baltimore.

In the first place, the office was a necessity, no matter who was treasurer; so was the seal and so were the blank certificates; and that Crawford's custody of the seal was not an act of culpable negligence on the part of the directors is shewn by the case *of the Bank of Ireland vs. Evans' Trustees*, 5 *H. of Lords*, 403. The same reason applies to the custody of the blank certificates.

The possession by the transfer agent of a corporation of the transfer books of its stock, and the authority to allow them to be used, do not constitute the *indicia* of an authority to make representations as to the ownership of stock, so as to make the company *liable for* the falsity of such representations. 9 *Bos.*, 283.

In the next place, this is a suit against the corporation, a body of stockholders represented by the directors; and whatever might be the liability of the latter under other circumstances than those which exist in this case, there can, it is thought, be no question that they could not be the agents of the stockholders to commit a fraud, either directly themselves, or by any act of negligence in the appointment or supervision of agents under them. See *Dodgson's Case*, 3 *De Gex & Smale*, 90; *Bernard's Case*, 5 *De Gex & Smale*, 289; *Mixer's Case*, 4 *De Gex & Jones*, 586.

Were the negligence of the directors, in this case, which is most emphatically denied, proven, the company would not be liable in the present action.

In the case of the *Western Bank of Scotland vs. Addie*, 1 *Scotch and Divorce Appeals*, 145–167, Lord CRANWORTH

at p. 167, is quoted as saying: "An attentive consideration of the cases has convinced me that the true principle is, that these corporate bodies, through whose agents so large a portion of the business of the country is now carried on, may be made responsible for the frauds of those agents to the extent to which the companies have profited from these frauds, but they cannot be sued as wrong-doers, by *imputing to them the misconduct of those whom they may have employed*." See *Benjamin on Sales*, 350; *Swan vs. The North British Australasian Company*, 7 *Hurl. & Nor. Exchequer Reports*, 601–661.

This case was carried by writ of error to the Exchequer Chamber and was affirmed by six out of seven judges. *Vide* 32 *Law Journal, N. S., Court of Exch.*, 273.

*Third.*—The position of the plaintiff below as bailee of Crawford.

In the first place it appears from the record that the certificates in question were issued by Crawford for his own use. That he could have made the company responsible for them will not of course be pretended. He did not sell the stock. Tome therefore was not a purchaser. He held the stock as a security. Had he any better right to it than Crawford had as against the company? A bailee, says Story, can never be in a better position than his bailor. *Story on Bailment, sec.* 102; *Wilson vs. Anderton*, 1 *Barn. & Adol.*, 450; *Ogle vs. Atkinson*, 5 *Taunton*, 759; *Biddle vs. Bond*, 118 *E. C. L.*, 231; *Coleman vs. Rices*, 7 *J. Scott*, 16, *C. B.*, 104, (81 *E. C. L.*, 115.)

Bowie, J., delivered the opinion of the Court,

The main question involved in this cause, is the extent of the liability of private corporations, for the acts of their agents, done within the scope of their employment, expressed or implied.

The inquiry is of peculiar interest, not because of any novelty of principle, but on account of its application to a class of corporations, which have multiplied with amazing rapidity, in modern times, and absorbed a vast proportion of the capital and commerce of the country.

As the relation of principal and agent is common to all classes and conditions of life, the principles which govern it are of universal application.

All persons, natural and artificial, capable of entering into this relation are subject to its laws. From the humblest position of domestic service, to the highest grade of financial or commercial employment, a common principle controls its obligations.

The maxim, *"qui facit per alium facit per se,"* on which it is said the whole law of principal and agent rests, is based on the instinct of natural justice; that in all employments and business of men, those who create or appoint agents for their own convenience and advantage, should be liable for their acts of omission or commission, in the course of their employment.

From considerations of policy, public corporations, such as States or municipalities, are exempt in a great degree from responsibility for implied authority, founded on the conduct of those they employ; but private corporations, like the individuals who compose them, are held to rigid accountability for the acts of those whom they have held out to others as worthy of trust.

The record contains six bills of exceptions, taken by the appellant; the first five, to the rejection and admission of certain evidence; the sixth, to the rejection of the prayers of the appellant, and the granting of those of the appellee.

The last exception presenting questions of law, which are peculiar to and govern the case, and the preceding exceptions, such only as are incidental, we shall examine them inversely.

As the pleadings contain a summary of the facts and the issues to which the prayers apply, a synopsis of them will be a proper preliminary.

The suit was instituted on the 1st of April, 1871, in the Superior Court of Baltimore city, by the appellant against the appellee, for the refusal of the latter to issue to the former, certain new certificates of stock, in lieu of others previously issued to and held by the appellant, and presented for renewal, in pursuance of notice requiring the holders of stock to present and renew their certificates.

The *narr*. contained six counts—the first, second and third for refusing to renew a certificate of 200 shares, issued the eighth of April, 1870,—the fourth, fifth and sixth for refusing to renew a certificate of 350 shares, issued the 2nd of October, 1869.

The gist of these several counts is referred to and traversed by the pleas.

The defendants pleaded to the first and fourth counts, that the certificates in said counts mentioned were spurious and not genuine, as the name of the president of the Parkersburg Railroad Company, upon the face of said certificates, is not the genuine hand-writing of said president. To the second and fifth counts, that in issuing the certificate mentioned in said counts, the same being spurious and not genuine, inasmuch as the name of the president is not the hand-writing of the president, the agent of the said company, mentioned in said count, acted without the scope of his employment. To the third and sixth counts the defendants deny that they have prosecuted their business, in the matter of issuing certificates of stock, in a grossly unskilful and improper manner, and with want of proper care, skill and diligence.

The defendants afterwards filed additional pleas, alleging that the certificates mentioned were issued without

authority and fraudulently, and not for the use and benefit of the defendants, but for the use and benefit of the agent.

To the additional pleas the plaintiff (the appellant) replied that John L. Crawford was the treasurer and transfer agent of the defendants, and placed in sole charge of its office in Baltimore, and in possession of their books, containing certificates of stock, signed in blank by the president, and in issuing the certificates, Crawford acted in the exercise of a power conferred upon him by the defendants as their treasurer and transfer agent; that the plaintiff advanced his money upon the collateral security of the certificates, without any knowledge or suspicion that Crawford as treasurer and transfer agent, was acting fraudulently, and that the defendant is estopped from saying the certificates were fraudulently issued, etc.

For replication to the defendants' second amended plea, the plaintiff said, that whether said certificates were fraudulently issued by Crawford, without lawful authority or not, or whether they were issued for his use and not for the benefit of the defendants, or whether the defendants received any benefit, nevertheless the plaintiff was entitled to maintain his action, because Crawford, in issuing the certificates, acted within the scope of his employment as treasurer and transfer agent.

The issues made by the pleadings, briefly expressed, are as follows:

1st. Whether the certificates of stock alleged to be issued by the appellees to the appellant were genuine or spurious?

2nd. Whether they were issued by the treasurer and transfer agent within the scope of his employment?

3rd. Whether the appellees conducted their business in the matter of issuing the certificates of stock in a grossly unskilful manner, and without due care and diligence?

4th. Whether the certificates were issued without authority and fraudulently by the treasurer and transfer agent?

5th. Whether the appellees were estopped by the facts and circumstances of the case from denying the authority of their agent and the genuineness of the certificates?

Some of these issues present, perhaps, questions of law as well as of fact, but all errors of pleading were waived, and it was agreed that either party might present, for the judgement of the Court, any question that the facts might authorize.

The appellant's prayers, upon the hypothesis, that the facts contained in them respectively are proved, without referring to them specifically, present the following propositions substantially, viz:

1st. The appellee is responsible to the appellant for the amount which he has lost through the act of its agent, whether the certificates of stock upon which the loans were made, have the genuine signature of the president, or whether they are forged, or whether the money went into the treasury of the appellee, or into the pockets of Crawford, *if the certificates were issued in the course of, and within the scope of his employment as agent.*

2nd. That the appellee is estopped from denying the facts set out in the certificate issued by its agent, and authenticated by its seal, in the due course of his employment and within the scope of his authority.

That the corporation cannot set up the fraud of its own agent as a defence, because the act of the agent is its own act, and such defence would be relying on its own fraud.

3rd. That the negligence of the appellees, in the management and conduct of their corporate affairs, contributed to the perpetration of the frauds upon the ap-

pellant, and concludes them from denying their responsibility for the acts of their agent.

The appellee's prayers negative these propositions, and are generally the converse of them.

The questions involved in them are thus epitomized in the appellee's brief.

1st. That no recovery can be had under any circumstances, on the certificates offered in evidence, without proof of the genuineness of the signatures of the president and treasurer, and of the seal of the company.

2nd. That no recovery can be had, even if the certificates were genuine, as regards the seal and signatures, and in other respects, if they were issued by Crawford for his own benefit, without authority; and that there is nothing in the evidence to estop the defendants below from setting up a want of authority.

3rd. That if the said certificates gave to Crawford no right which he could enforce against the company, the hypothecation of them to the plaintiff below, his bailee, could confer no rights which he did not possess himself.

The appellant's prayers are predicated on the theory of a general agency; the appellee's on a special or limited authority.

In the very excellant compendium of Mercantile Law, by Smith, the rights of third persons against principals are very clearly and forcibly defined, as follows:

"As far as the agent's authority extends, he has a right to bind the principal to third persons. Now his authority may, as we have seen, be either expressly given or inferred from the acts of his supposed principal. When it is expressly given, there can be no doubt as to its extent, except from the uncertainty of words employed in delegating it. When, however, it is to be inferred from the conduct of the principal, that conduct furnishes the only evidence of its extent as well as of its existence; and in solving all questions on this subject, the general

rule is, that the extent of the agent's authority is (as between his principal and third parties,) to be measured by the extent of his usual employment, for he who accredits another by employing him, must abide by the effects of that credit, and will be bound by contracts made with innocent third persons, in the seeming course of that employment, and on the faith of that credit, whether the employer intended to authorize them or not; since where one of two innocent persons must suffer by the fraud of a third, he who enabled the third person to commit the fraud, should be the sufferer." *Smith's Mer. Law,* 56, 57, (*London Edition,* 1834.)

This principle is applied to cases respecting notes or bills, which, if drawn, endorsed or accepted by a clerk, who has been previously allowed to do so, bind the master, though the money never came to his use; and to sales and guarantees; in a word, to every species of mercantile transaction; and whether the agent have or have not been dismissed from his employer's service, provided, that the third party had no reason to be aware of the determination of his employment. *Vide Prescott vs. Flinn,* 9 *Bing.,* 21; *Boulter vs. Arlesdon,* 1 *Sel.,* 234; *Barber vs. Gingell,* 3 *Esp.,* 60; *Haughton vs. Ewbank,* 4 *Camp.,* 88; 12 *Mod.,* 346, *cited by Smith.*

The American doctrine on this subject is announced by Story, in terms equally emphatic and comprehensive, viz:

"It is a general doctrine of law, that although the principal is not ordinarily liable (for he sometimes is,) in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in those acts or misdeeds; yet, he is liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed

know of such misconduct, or even if he forbade the acts or disapproved of them.　In all such cases the rule applies *respondeat superior*; and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him, through the instrumentality of agents.　In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency." *Story on Agency, 7th edition, ch.* 17, *sec.* 452; *Penn., Del. & Md. Steam Nav. Co. vs. Hungerford,* 6 *G. & J.,* 291; *Lord* HOLT'S *opinion in Lane vs. Cotten,* 12 *Mod.,* 490; *Paley on Agency, by Lloyd,* 294, 301, 307; *Bac. Abrid., Master and Sert. R.*　These principles apply as well to *private corporations,* as to natural persons.

"As natural persons are liable for the wrongful acts and neglects of their servants and agents, done in the course and within the scope of their employment; so are corporations upon the same grounds, in the same manner, and to the same extent." *Angell and Ames on Corps., ch.* 9, *sec.* 310; *Albert vs. The Savings Bank of Balto.,* 1 *Md. Ch. Dec.,* 407; *Thatcher vs. Bank of N. Y.,* 5 *Sand.,* 121; *Thompson vs. Bell,* 10 *Exch.,* 10, (26 *Eng. L. and Eq.,* 536;) *Bargate vs. Shortridge,* 5 *Ho. of Ld. Cases,* 297, (31 *Eng. L. & E.,* 44;) *Nat. Exch. Co. vs. Drew, H. L.,* 1855, (32 *Eng. L. & E.,* 1;) *Stevens vs. Boston and Maine Railroad,* 1 *Gray,* 277; *Blackstock vs. N. Y. & Erie R. R. Co.,* 1 *Bosworth,* 77.

These obligations spring, as we have said, from the dictates of natural justice, the policy of the law, and the necessities of society; they are common to all civilized communities, ancient and modern, and derived mainly from the civil law.　In commercial countries, where capital is centered in large corporations, whose stock is

the subject of continual change by sale or hypothecation, operations which must be conducted by the agency of individuals whose powers can be ascertained only by the extent of their usual employment, the importance of maintaining these principles can scarcely be over-estimated.

It is conceded in this case that the appellees are a corporation, created by the State of West Virginia, that immediately after the re-organization of the company, it made an agreement with the Baltimore and Ohio Railroad Company, by which the latter undertook to work the Branch Road, and thereafter the management of the road became, on the part of the Parkersburg Company, simply a supervision of accounts between the companies.

"That at the first stockholders' meeting, held the 10th of May 1865, the following directors were appointed, and continued in office by annual re-election, until August 1870, when Crawford's frauds were discovered:"

> P. G. VAN WINKLE,
> JAMES COOK,
> JOHN R. MURDOCK,
> GEORGE NEALE, JR.,
> > Of Parkersburg,
> JOHNS HOPKINS,
> COL. O'DONNELL,
> WM. McKIM,
> C. M. KEYSER,
> B. DeFORD,
> THOS. SWANN,
> JOHN W. GARRETT,
> > Of Baltimore.

Two standing committees were appointed, viz:

Messrs. McKim, Garrett and Murdoch, Committee of Finance; Messrs. DeFord, O'Donnell and Cooke, Committee on the Road.

At this meeting, P. G. Van Winkle was appointed President, W. W. Van Winkle, Secretary and John L. Crawford, Treasurer and Stock Transfer Agent.

The following By-Laws or Resolutions were adopted at this meeting.

*Resolved,* "That the officers of this company, subordinate to the president, shall be a treasurer and Secretary, who shall hold their respective offices during the pleasure of the Board. *The duty of the Treasurer,* in addition to the usual functions of such an officer, *shall be to keep the ledger and other books, relating exclusively to the ownership and transfer of the capital stock of the company; to prepare and countersign all certificates of ownership of stock and scrip hereafter issued,* and *to receive and enter upon the proper books, all transfers thereof.* He shall affix *an impression of the seal of the company to all certificates of ownership of stock and scrip properly issued by the company,* and *signed by the president,* and also, to such other instruments, and papers, as are required by law, or the by-laws of the company, or may be directed by the Board, to be under seal. He shall give bond, with security to be approved by the president, in the penal sum of ten thousand dollars, conditioned for the faithful performance of the duties of his office, during his continuance therein, and for accounting for, and paying over to his successor, all money, security and other property, which may come to his hands by virtue thereof. Until the further order of the Board, he shall keep his office in the city of Baltimore; and in case of absence or inability to act of the Secretary, shall discharge such duties of the latter, as may be required by the Board or President. His salary shall be at the rate of two hundred and fifty dollars per annum.

*Resolved,* "That the president and treasurer are hereby authorized and directed *to issue certificates of ownership of stock and scrip directly, to such parties as have heretofore*

*assented to the terms of re-organization, whether. they have or have not their respective certificates of allotment,* and also, *to those who shall hereafter so assent, in the said terms on the surrender to be cancelled of the stock certificates, bonds,* and *other evidences of debt* of the late North-Western Virginia Railroad Company, owned or held by them respectively.

*Resolved,* "That the capital stock of this company, be increased by the addition of so many shares of the par value of fifty dollars each, to the amount of the capital stock of the late North-Western Virginia Railroad Company, as may be necessary to cover the stock issued, and *to be issued,* in redemption of the obligations, debts and stock of the said late company, the gross amount of the stock so issued to be deemed and taken to be the cost of the works and property in the hands of this company, agreeably to the resolutions of the stockholders, adopted at an adjourned meeting held on the 24th day of May last.

*Resolved,* "That the seal prepared for the use of this company and now exhibited, having as a device a steamboat, locomotive, etc., with the legend, 'Parkersburg Branch Railroad Company,' be, and the same is hereby, adopted as the common seal thereof, and shall remain *in the custody of the president,* and shall be affixed to all certificates of stock and scrip, and all other instruments requiring a seal executed on the part and by authority of this company."

But one meeting of the directors was held between that of Sept. 1865 and August 1870, viz., on the 17th of Sept. 1867, at which no business of importance was transacted.

It has been argued on the part of the appellee, that these by-laws conferred a special authority only on the treasurer and transfer agent, which all persons dealing with him were bound at their peril to know. This, however, is not the doctrine of the text-writers or best ad-

judged cases, as to *private* corporations. By-laws of a *private* corporation are *generally* binding upon none but its members or officers.

These they obligate upon the ground of their express or implied assent to them. *Angell and Ames on Corps., sec.* 359, *and authorities in note.*

By-laws of a *Public Municipal Corporation* are regarded as public acts. *Vide Mayor, &c. of Baltimore vs. Reynolds,* 20 *Md.,* 1.

These by-laws or resolutions prescribe and define the powers and duties of the treasurer and transfer agent, as between the corporation and himself, and all persons having knowledge of their method of doing business. *Angell and Ames on Corps., ch. X., sec.* 325, 359—*citing Cummings vs. Webster,* 43 *Me.,* 192 ; *Bank of Wilmington vs. Wollaston,* 3 *Harrington, Del.,* 90.

By these, "the treasurer is made the custodian of the ledger and other books relating exclusively to the ownership and transfer of the capital stock of the company," he is authorized "to prepare and countersign all certificates of ownership of stock and scrip thereafter issued," and "to receive and enter upon the proper books all transfers thereof;" "to affix an impression of the seal of the company to all certificates of ownership of stock and scrip, *properly* issued by the company and signed by the president." In a word, he is constituted the executive of the corporation, with large discretionary powers. But an agent's powers (as we have seen) do not depend solely on the express letter of his instructions. "Their extent, as well as existence," as said by Paley, "are often determined by the conduct of the principal towards the agent, and measured by his usual employment."

There was no limit in this case as to the amount of stock to be issued.

It is conceded that no objection is made to the certificates on the ground that they were over-issues.

The seal of the corporation and signatures of the treasurer and transfer agent are admitted to be genuine.

The first of the appellant's and appellees' prayers, are based on the hypothesis that the signatures of both president and treasurer are genuine. Yet the appellees insist, notwithstanding they may be genuine, if the jury shall find that the certificates were issued by the treasurer, fraudulently and surreptitiously, for his own use and benefit and not for the use and benefit of the appellees, the appellant is not entitled to recover.

This theory denies all liability of the principal for the fraudulent act of the agent, unless that act enures to the benefit of the former; a proposition which cannot be adopted without abandoning all the principles previously cited from the text-books, supported by a long series of decisions.

Paley, in his chapter on the obligation of principals, for the neglect or fraud of their agents, after announcing the proposition, that " if a man employ an agent in the commission of a fraud, he is clearly liable for it himself," adds, "And employers are also civilly liable for frauds committed by their servants or agents, without their authority, if done in their employment," for which he cites, 1 *Str.* 653, *S. P;* (*per Lord* ELLENBOROUGH *in Crockford vs. Winter,* 1 *Campb.,* 127; *Paley, ch.* 3*d,* 302.)

The ground of liability is not that the principal has been benefited by the act of the agent, but that an innocent third person has been damaged by confiding in the agent, who was accredited by the principal, as worthy of trust, in that particular business.

In the case of *Jones vs. Perchard,* 3 *Esp. Cases,* 507, cited by Paley in note (o) p. 300; a sheriff was held liable for money wrongfully taken by his bailiff, under color of his office, in an action for money had and received; " but the plaintiff (it was held) need not show that the money came to the sheriff's hands."

The modern case of the *Bank of Kentucky vs. The Schuylkill Bank*, decided by the late president, Judge KING, in the Court of Common Pleas of the First Judicial District of Pa , and affirmed by the Supreme Court of that State, furnishes analogies, and establishes principles, which will aid us much in arriving at correct conclusions, in the present case.

The Bank of Kentucky, in 1835, resolved to establish agencies in New York, Philadelphia and New Orleans, under their by-laws, relating to the transfer of stocks. The Schuylkill Bank, (of which Hosea J. Levis, was Cashier,) was appointed the agent at Philadelphia.

By the authority conferred on the Schuylkill Bank, that bank could only place on their stock ledger, such shares as were originally subscribed at Philadelphia, or those transferred by warrants from the principal Bank at Louisville, and the agency at New York.

It was alleged, that if the Schuylkill Bank had acted faithfully as transfer agent, no one could, or would have been permitted, to transfer stock where there was no stock to his credit on the books. It was further alleged, that various persons, having no stock on the books, were permitted to transfer shares, purporting to be shares of the Bank of Kentucky, on the ledger of the agency at Philadelphia, and among others, H. J. Levis, the cashier, had transferred 13,374 shares when he had none, or any authority from those who had, whereby the Bank of Kentucky was charged with stock amounting to one and a quarter millions of dollars; which they were afterwards compelled to redeem or recognize as genuine.

These over issues were charged to have been made for the use and benefit of the Schuylkill Bank, and the greater part of the proceeds appropriated to the purposes of that bank.

The Bank of Kentucky claimed to be reimbursed by the Schuylkill Bank, for the amount of the spurious issues.

The Schuylkill Bank denied the agency, or that the over-issues were made with their knowledge, privity and consent; insisted that Levis, in his individual capacity, was such agent exclusively; and with Levis in that relation, the Schuylkill Bank, had no connection.

The case was discussed under two prominent points:

1st. That the Schuylkill Bank, was in law and in fact, the transfer agent of the Bank of Kentucky, and responsible for the defaults charged in the bill.

2ndly. That if the first was not sustained, the Schuylkill Bank, under the circumstances, was liable to pay over to the complainants the proceeds of the sale of the spurious stock of the Bank of Kentucky, deposited by Levis in the Schuylkill Bank.

Among other arguments for the defendants, it was insisted that the complainants' right to recover, depended upon their legal liability for the frauds of their agent, and they were not liable, because the capital stock of the Bank of Kentucky, was limited to 50,000 shares, and the spurious shares were in excess of it, and the principal, much less the agent, could not enlarge the capital of the corporation.

3rdly. Because the holders of the spurious stock, were bound to inquire into the authority of the agent, which required certain acts to be done, viz: *the surrender of the old certificates,* before new certificates could be issued.

Having shown that these preliminary provisions were intended for the protection of the corporation from embarrassment between legal and equitable claimants to the same stock, and secure them for liens or claims on its stock, and referred to numerous decisions to sustain those views; the learned Judge returns to the argument thus: "Who conducts the preliminaries resulting in the issue of the new certificates? Why, the bank itself, or what is the same thing on this occasion, its agent lawfully constituted for this purpose. The idea, that the

purchaser of stock is to lose the property he has honestly paid for, because the bank has not done its duty to itself is unreasonable to the last degree. It would seem strange, indeed, to an unsophisticated understanding, if such a notion could be invoked successfully to save the Bank of Kentucky from the results of its own misapplied confidence in a faithless agent. The true doctrine on this subject is, that where one of two innocent persons is to suffer for the tortious act of a third, he who gave the aggressor the means of doing wrong, must also bear the consequences of the act. If, therefore, the Bank of Kentucky was responsible for the frauds of its agent, there is nothing in the circumstances under which the holders of the spurious stock received their certificates, which exempts it from this liability.''

After an exhaustive argument, in which many of the text-books and cases previously referred to, are cited, the learned Judge concludes that branch of his opinion in these emphatic terms: ''The principal holds out his agent as competent and fit to be trusted, and thereby in effect, be warrants his fidelity, and good conduct in all matters of the agency.'' The Bank of Kentucky, *was then responsible for the frauds of its agent, whoever that agent was, and did no more than justice required, and law would surely have coerced, when it compensated the holders of the spurious stock.*

The fact that the proceeds of the spurious stock enured to the benefit of the Schuylkill Bank, does not seem to have been relied on by the Court; and referring to the second head, whether supposing Levis to have been the agent of the complainants, the defendants are not bound to pay the complainants the amount received from the sale of the spurious stock, they say, it is unnecessary to decide it, the decision of the first, superseding the necessity of such inquiry.

A very analagous case is that of the *N. Y. and N. H. R. R. Co., against Schuyler and others,* 34 *N. Y.,* 61–78,

decided by the Court of Appeals of New York in 1865, in which all the previous cases in that and other States as well as in England were reviewed. It is a compendium of the law as to the liability of corporations for the acts of their agents done within the scope of their employment, or resulting from negligence of the principal, amounting to "*estoppel in pais.*"

Adopting the general principle before announced, that a corporation is liable to the same extent and under the same circumstances as a natural person, for the consequences of its wrongful acts, and will be held responsible in a civil action at the suit of the injured party, for every grade and description of forcible, malicious, or negligent tort or wrong, which it commits, however foreign to its nature or beyond its granted powers, the wrongful transaction may be, it declares, "the incapacity to create the spurious stock would be no defence to an action for damages for the injury."

On the contrary, that very incapacity, since it would render the certificate or transfer, a fraud or deceit, would itself be the cause of the injury, and the basis of recovery. No Court would hear the corporation assert its wrongful act was beyond its chartered limits, and therefore ineffective to charge it with the injurious consequences of fraud. But in this case, the false certificates were issued, and the spurious stock transferred by an officer of the corporation. A corporation aggregate being an artificial body—an imaginary person of the law—so to speak, is from its nature incapable of doing any act, except through agents, to whom is given by its fundamental law, or in pursuance of it, every power of action it is capable of possessing or exercising, hence it is liable to the same extent, and under the same circumstances that a natural person is chargeable with the acts or negligence of his agent, and if the agent conducts himself fraudulently, the same principles prevail where the principal is a corporation.

From these premises, the following among other conclusions are reached:

"Where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which, the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith, pursuant to the apparent power, may rely upon the representation, and the principal is estopped from denying its truth to his prejudice." *North River Bank vs. Aymar,* 3 *Hill,* 262; *N. Y. & N. H. R. R. Co. vs. Schuyler, et al.,* 34 *N. Y.,* 73.

As a consequence of these principles, the Court held that certain defendants who had acquired spurious stock from Schuyler, although not entitled to become stockholders, were entitled to indemnity from the company for the fraudulent acts of their president and transfer agent, whose authority they were estopped from denying by the facts and circumstances of the case. 34 *N. Y. Reports,* 50, 51, 53, 61.

In the very recent case of *Titus vs. The President, &c., of the Great Western Turnpike Road,* 5 *Lansing,* 250, 255, the corporation was held liable for money advanced to the treasurer by an innocent third person, upon spurious certificates of stock, issued by the treasurer to himself, and signed by him, in conformity with their by-laws. In that case the Supreme Court of New York said: "'The liability of the principal for such acts of its agent was distinctly affirmed in the *N. Y. & N. H. R. R. Co. vs. Schuyler,* and in *Bruff vs. Mali,* (36 *N. Y.,* 200.'')

The cases cited by the appellees, prior in date, and in conflict with the principles announced in 34 *N. Yk.* and 5 *Lansing,* are of course overruled. We do not think the case of *Swann vs. The North British Austrn. Compy. in the Court of Exchequer Chamber,* 46 *Law Journal,* 273,

conflicts in principle, with the cases above cited; but differs rather as to the degree of negligence, which constitutes estoppel *in pais*. The broker in that case, who forged the instruments, was not clothed with a general authority to represent his principal, and conduct their business, as in the present case.

The case of the *Bank of Ireland vs. The Trustees of the Evans' Charities*, 5 *Hs. of Lords Repts.*, 389, relied on by the appellees, is of the same general character. The stock sought to be transferred was not that of a corporation issuing stock, of which the defaulting agent was the secretary, but stock held by the trustees in the Bank of Ireland. Grace, the secretary of the trustees, was not transfer agent of that stock, or authorized to affix the seal of his principals to any instruments. "He took advantage of his being secretary to the trustees, and thereby having the custody of the seal." The power to order and dispose of the seal of the corporation, and the use and application thereof, was vested in three trustees; Crawford, on the contrary, had authority to affix the seal of the company to all certificates of ownership of stock, properly issued by the company and signed by the president. The doctrine laid down by that case is, "that the negligence which would deprive the corporation of the right to insist the transfer was invalid, must be negligence in, or immediately connected with the transfer itself," a position, in our opinion, not inconsistent with the facts on which the prayers of the appellant are based.

Since the argument of this cause, the case of the Queen on the prosecution of *Robson vs. The Shropshire Union Railways and Canal Compy.*, in the Exchequer Chamber, has been reported in 8 *Queen's Bench*, (*Law Rep.*,) 420, 421.

This was an application for a mandamus, requiring the defendants to register certain certificates of stock held by the administratrix of an equitable mortgagee of

certain shares, standing in the name of the equitable mortgagor, who was a trustee of the stock and a director of the defendants.

The Queen's Bench, consisting of COCKBURN, C. J., MELLOR, HANNEN and QUAIN, J., refused the mandamus, but on appeal to the Exchequer Chamber, their judgment was reversed, and it was held "that the defendants are, under the circumstances of this case (as between them and the prosecutrix) the persons who must suffer for the consequences of a breach of trust of G. Holyoake, (the trustee,) which consequences are attributable to their giving him, or rather *perhaps negligently allowing him to obtain, he being a director,* indicia of property which he did not possess."

Numerous other authorities establish by analogy the principles above announced ; among these may be cited 2 *Hill,* 461, the case of the *U. S. vs. Davis,* and 10 *Wallace,* 649, *Merchants' Bank vs. State Bank.* In the former, a director of the bank took a note for discount, and appropriated the proceeds to his own use; in the latter, a cashier certified that a person having no deposit, had gold on deposit ; in both cases the bank was held responsible. So also in 10 *Gray,* 532, the case of the *Atlantic Bank vs. The Merchants' Bank*—a bank whose teller certified a check when the drawer had no funds, was held responsible for the act of its officer.

In the case of *Lister & Supplee vs. Allen,* 31 *Md.,* 547, this Court has adopted the language of Judge STORY in his work on Agency, sec. 443, as follows: "But the responsibility of the principal to third persons is not confined to cases where the contract has been actually made under his express or implied authority. It extends further, and binds the principal in all cases where the agent is acting within the scope of his usual employment, or is held out to the public or to the other party, as having competent authority, although in fact he has, in

the particular instance exceeded or violated his instructions, and acted without authority. For in all such cases, where one of two innocent persons is to suffer, he ought to suffer who misled the other into the contract, by holding out the agent as competent to act, and as enjoying his confidence.''

·'So if the principal should clothe the agent, although a mere special agent, with all the apparent muniments of an absolute title to the property in himself, the principal would be bound by the acts of the latter; as, for example, if he should clothe him with the apparent title to property by a bill of lading of a shipment, as by making the shipment appear to be on account of the agent, or should trust him with negotiable securities, endorsed in blank, a sale or disposal thereof by the agent, although in violation of his :private orders, would bind the principal, and give correspondent rights and remedies to third persons, who become *bonâ fide* possessors under such sale, or other act of disposal, against him.''

The parallel between the instances above cited, in which the principal's liability was fixed, and the facts upon which the appellant's first and second prayers are based, is too obvious to require comment. If the principal is civilly responsible for the frauds of his agent, as seems to be settled by the foregoing authorities, it cannot be material what shape the fraud assumes. It would be illogical to suppose that the liability of the principal is lessened by the magnitude of the fraud—that the greater the breach of trust on the part of the agent, the less the responsibility of his employer.

Every species of *"crimen falsi"* not accompanied with force—theft, forgery and perjury, are only frauds of a deeper dye. To exonerate the principal because the fraud of his agent amounted to a felony, would violate the reason of the rule, *"respondeat superior,"* deprive innocent third persons of all indemnity, expose them to

the risks of fraudulent devices, most dangerous, because most difficult to detect, and leave them without any protection, other than the fear of prosecution and punishment.

The common law, which, in some cases, suspends or merges the civil remedy against the culprit, does not, in any case, take away the remedy against those who are expressly or impliedly responsible for him.

The decisions of the highest Courts of Pennsylvania and New York, establish the principle that the liability of the corporation is not limited to acts within its chartered powers, done by its agents, but they are responsible notwithstanding the act is beyond its legal capacity to do or contract, hence, although the stock issued by Schuyler and Davis was spurious, that is to say false, the principals were held liable in damages to innocent third persons.

The act of Crawford in issuing stock without the genuine signature of the president, is not a greater violation of the charter of the appellees, than the over-issues of stock in the cases cited. Both were frauds on the respective corporations and their stockholders; the act of Crawford differs only in form.

It is essential to public welfare, that where the acts of acknowledged agents are accompanied with all the *indicia* of *genuineness*, and issued for a valuable consideration, the principal should be responsible, whether the *indicia* are true or not. Such liability would conduce to greater vigilance on the part of the principal, greater fidelity in the agent, and greater security to all dealing with them.

It necessarily results, we think, from the foregoing reasoning, and the cases cited, that the appellant's first, second, third and seventh prayers, should have been granted, and the appellees' counter proposition, viz: first, third, fourth and seventh rejected.

The conclusion arrived at as to the appellant's first, second, third and seventh prayers renders it unnecessary,

in our judgment, further to discuss the prayers involving the question of negligence which has been incidentally referred to in the cases cited, as the ground of "*estoppel in pais.*" Independently of that aspect of the case, there was enough in the facts mentioned in the prayers of the appellant above enumerated, which, if found by the jury, would have entitled the appellant to recover.

The appellee's second prayer, which places the appellant in the position of bailee of Crawford, and asserts he has no other or better title than Crawford, at the time of the pledge, is founded, we think, on a misapprehension of the true relation between the appellant and appellee. It does not appear that the loan was made to Crawford, or that the certificates of stock were ever held by him; on the contrary, the loan was made to one Rich, without knowledge of the appellant until Crawford's difficulties became public, that he was the person for whom Rich wanted the money.

To constitute the relation of bailor and bailee, there must have been evidence of title in the bailor, to the certificates in question, and a transmission of that title to the appellant, through the bailor. The agent, Rich, did not disclose his agency or borrow the money, upon any specific certificates already issued and held in the name of Crawford, but upon certificates which he procured to be issued directly to the lender, as of the date of the loan.

There was no privity between the appellant and Crawford. The appellant does not claim through him, but through the certificate issued by him as the agent of the corporation. The action is not "*ex contractu*" but "*ex delicto;*" it does not seek to enforce the contract contained in the certificate, but supposing it to be genuine, it claims damages for the non-performance of a public duty, which the corporation by its charter assumed; or if not genuine, for the loss and injury inflicted on the

appellant, by the fraud and tort of the agent of the appellee. As said in 34 *N. Y.*, the fraud constitutes the cause of action, and no Court would suffer a defendant to set up the fraud of himself, or his agent (which is by construction his own act) as a bar to the action, otherwise, fraud would be invincible and incurable.

The measure of damages, prescribed by the modification of the Court, of the appellant's fifth prayer, is as we understand that modification, the proper standard.

By that it is left to the jury to determine, whether under all the circumstances, without regard to the causes of depreciation of the stock (if any) at the time of the loan, the appellant is entitled to recover the amount of the money advanced on the stock with interest, or the amount of the market value of the stock, with interest, (if they deem it proper to allow interest;) but in no event to allow more than the amount of the money loaned with interest, if the value of the stock should exceed said loan and interest.

The exceptions to the rulings of the Court in respect to the evidence referred to in them will now be considered.

The testimony of J. L. Johnston, the rejection of which was the subject of the appellant's first exception, being supplied by the admission of the same evidence on the part of the appellee, it is unnecessary to comment on its character and competency, further than to say, such testimony was pertinent and admissible.

The second bill of exceptions is waived by the appellant.

The third involves the admissibility of the record of the proceedings of the directors of the defendant's Company, of the 10th of August, 1870.

By agreement of counsel, the record of the proceedings of the appellee's company, is made a part of the record of this case. It appears from this, that at a meeting of

the directors of the company, held in August, 1870, after the discovery of Crawford's frauds, a report was made by the Finance Committee, setting out in detail the extent of Crawford's over-issues of stock, etc.,—and that one of the certificates, held by the appellant, did not appear upon that list.

The plaintiff offered to read the proceedings of the 10th of August, (which it is presumed are the proceedings referred to in the agreement of counsel, and which are described as of August, 1870,) the bill of exceptions does not state for what purpose, but the appellant argues, "That they were proper evidence to show what stock was reported to the board of directors of the defendants as fraudulent, and to let the jury see (which was the fact) that some of the stock sued upon in this case had not been so reported, they might consider that fact as some evidence of its authenticity."

The plaintiff read from the record of the various meetings of the stockholders and directors of the defendant *prior to August the* 10*th,* 1870, without objection; but when he offered to read the proceedings of the 10th of August, the defendant objected and the Court sustained the objection.

"Books of a corporation are, at common law, regarded as public to a certain extent with respect to its members, but private with respect to strangers. A rule for a limited inspection of the documents of a corporation will be ordered by the Queen's Bench, provided it is shown such inspection is requisite with respect to a suit then instituted, or at least to some specific dispute or question depending, in which the applicant is interested, but in this case the inspection will be granted to such an extent only as may be necessary for the particular occasion."— 2 *Taylor's Evidence, sec.* 1346.

Although the right of the plaintiff, as a member of the corporation, was involved in the issue, the admission of

the record of the proceedings of the 10th of August, could not have been resisted on that ground, as the proceedings anterior were read without objection. The right of inspection was therefore conceded. The objection must have been the want of pertinency to the issue.

This objection, we think, was not tenable. The report of the committee on finance that one of the certificates of stock held by the appellant did not appear upon the list of "over-issues of the stock of the company," furnished the strongest negative proof that the certificate referred to was genuine and not spurious.

By Art. 75, sec. 69, of the Code of Pub. Laws, power is vested in the Courts, in the trial of actions at law, on motion made at the first Court after the appearance Court, to require parties to produce copies certified by a justice of the peace, of all such parts of all books or writings in their possession as contain evidence pertinent to the issue, etc., in cases and under circumstances where they might be compelled to produce such original books, or answer a bill of discovery, by the ordinary rules of proceeding in Chancery.

The original being before the Court, the only question remaining was, whether it was pertinent to the issue and such as would have been subject to production by the modes indicated.

The circumstances in this case required, we think, that the proceedings of the 10th of August should have been submitted to the jury, and the Court below erred in excluding them.

The fourth bill of exceptions was taken to the admission of the evidence of Joseph E. Paine, produced on behalf of the defendant to prove that the signatures of the president, Van Winkle, subscribed to the certificates, were not genuine.

The witness being interrogated as to his means of knowing Van Winkle's handwriting, said he had never

seen him write, nor received any letter from him, nor had he become acquainted with it in the course of business, but his knowledge on that subject, was derived from an examination of signatures of Van Winkle, in the two certificate books in evidence, which had been put in his hands by the defendant, for the purpose of enabling him to testify in this case, and that he had carefully examined them, for five or six months, and thus acquired a knowledge of the handwriting of Van Winkle.

The fifth exception was to the admission of the evidence of a photographer and expert in handwriting, and to the admission of photographic copies of certain genuine signatures of Van Winkle, taken by the witness, some of which were of the size of the original, and others of an enlarged size, and to the admission of his explanations, to show the differences between the genuine and those alleged to be forged, and to the admission of his opinion derived from a comparison of those copies with the originals, as to the genuineness of the signatures of Van Winkle, attached to the certificates sued upon in this case.

The plaintiffs objected to the offering of said copies in evidence to be examined by the jury, and to the examination of the witness in reference thereto, as stated; but the Court permitted said photographic copies to go to the jury as evidence, and also permitted the witness to be examined in reference thereto.

The question presented by these exceptions, although varied in form, is substantially the same, viz: whether the genuineness of hand-writing, can be established by the opinions of a witness, whose belief is founded upon a mere naked comparison of papers submitted for his examination, "*post litem motam.*"

In the case of *Smith vs. Walton,* 8 *Gill,* 86, Judge MARTIN, delivering the opinion of this Court, after adverting to the arguments in favor of the admission of evidence of

comparison, and conceding it had been done in some of the American Courts, declares "it is in conflict with the doctrine of the common law, as enunciated in Westminster Hall." In another paragraph, he says, "We consider it as the settled rule of the English law, which in this respect, we approve and adopt, that with the exception of ancient documents (an exception standing upon the necessity of the case,) signatures cannot be proved by a direct comparison of hands. By which it is meant, the collation of two papers in juxta-position for the purpose of ascertaining by inspection, if they were written by the same person." In support of these views, the remarks of Mr. Justice COLERIDGE in the leading case of *Doe, dem. of Mudd vs. Suckermore*, 5 *Adol. & Ellis*, 730, are cited, viz: "Our law has not during a long course of years, permitted hand-writing to be proved by the immediate comparison by a witness of the paper in dispute, with some other specimen, proved to have been written by the supposed writer of the first. * * * it was familiar to lawyers, that many attempts have been made to introduce this mode of proof, according to the practice of the civil and ecclesiastical laws, but after some uncertainty of decision, the attempts have failed."

On referring to the case of *Mudd vs. Suckermore*, it will be found, that the opinion of Mr. Justice PATTERSON, is especially applicable to the case before us.

After premising that there were only two modes of acquiring knowledge of hand-writing, which enabled a witness to speak in a question of hand-writing, considered sufficient in law, in both of which the knowledge is acquired incidentally and unintentionally, without reference to any particular object; the learned Judge remarks, "A third mode is now sought to be introduced, viz., by satisfying the witness by some information or evidence, that a number of papers are in the hand-writing of the party, and then desiring him to study those

papers, so as to acquire a knowledge of the hand-writing, and fix an exemplar in his mind ; and afterwards putting into his hand, the writing in question, and asking his belief respecting it.   *   *   *

"The very foundation of this mode is the establishment of the fact, that the papers, from studying which the witness is to acquire his knowledge, are the hand-writing of the party.   Now that fact must be established either by the acknowledgment of the party, or by the information of third persons.   I find no express authority that direct comparison of hand-writing is admissible in evidence, but many to the contrary." (5 *Adol. & Ellis*, 730 ; 2 *Steph. N. P.*, 1700.)

Judge TAYLOR, in his recent work on Evidence, speaking of the former and present law of England on proof of hand-writing, observes :

"Although all proof of hand-writing, except when the witness either wrote the document himself or saw it written, is, in its nature, comparison—it being the belief which the witness entertains upon comparing the writing in question with an exemplar formed in his mind from some previous knowledge ; the law, until the year 1854, did not allow the witness, or even the jury, except under certain special circumstances, actually to compare two writings with each other, in order to ascertain whether both were written by the same person."

"The technical rule of the common law, which was certainly not based on common sense, and which was directly opposed to the practice of our own Ecclesiastical Courts, of our Courts in India, of the French Courts and of the Courts of many of the most enlightened States of America, was happily for the administration of justice, abrogated by the Legislature in the year just named, so far at least as related to trials at *nisi prius*." *Vide* 17 *and* 18 *Vict.*, ch. 125, *secs.* 27, 103.

Hence it appears the common law rule excluding evidence by comparison, whether founded on principle or

precedent, was so established in England as to require a statutory enactment to control the decisions of the Courts The evidence offered in these bills of exception, being of that character, which was held inadmissible by the common law, as declared by the English jurists, and our own Courts, we are constrained to adhere to the rule as announced in those cases.

The testimony of the photographer comes within the same principle as that of Paine. It was offered to establish the forgery of the certificates in controversy, by comparing them with copies (obtained by photographic processes, either magnified or of the natural size) of certain signatures assumed or admitted to be genuine, and pointing out the differences between the supposed genuine and disputed signatures. As a general rule, in proportion as the *media* of evidence are multiplied, the chances of error or mistake are increased. Photographers do not always produce exact fac-similes of the objects delineated, and however indebted we may be to that beautiful science for much that is useful as well as ornamental, it is at last a mimetic art, which furnishes only secondary impressions of the original, that vary according to the lights or shadows which prevail whilst being taken. It follows from the foregoing that the judgment of the Court below must be reversed and the cause remanded.

> *Judgment reversed, and*
> *new trial ordered.*

(Decided 26th November, 1873.)

ALVEY, J., delivered the following separate opinion, dissenting in part, in which BARTOL, C. J., concurred:

In this case I much regret being compelled to dissent from the opinion of the majority of the Court, not as to the propriety of reversing the judgment appealed from, for in that result I agree, but as to the principles upon which the reversal proceeds.

The action is founded upon the alleged wrong of the defendant in repudiating certain stock certificates held by the plaintiff as being spurious and void, which, as the plaintiff alleges and contends, are either genuine or were issued under circumstances to render the defendant responsible for them.

At the trial below, several exceptions were taken by the plaintiff, some to rulings upon questions of evidence, and the sixth and last exception to rulings upon the prayers offered by the respective parties for instructions to the jury.

The only question of evidence in regard to which I differ from the majority of the Court, is that presented by the fourth exception.

Upon the question whether the signatures of Van Winkle, the president of the defendant, to the stock certificates, in respect of which the suit was brought, were genuine or forged, several witnesses had testified, some the one way, and some the other, and in that state of the proof the defendant produced a witness by the name of Paine, an expert in matter of hand-writing, by whom it was proposed to prove that he was familiar with the hand-writing in question, and that from his knowledge of it he believed the signatures not to be genuine. The witness being interrogated as to his knowledge of Van Winkle's hand-writing, stated that he had never seen him write, nor received letters from him, nor in the course of business had he become acquainted with it, but stated that his only knowledge on the subject was derived from an examination of the signatures of Van Winkle in the two certificate books *in evidence,* which had been placed in his hands by the defendant's counsel, for the purpose of enabling him to testify in the cause, and that he had carefully examined them for five or six months, and had thus acquired a knowledge of the handwriting of the party. Upon objection by the plaintiff to the

competency of this witness for want of knowledge of the hand-writing, the Court ruled him to be competent, and allowed him to give his opinion to the jury from knowledge thus acquired, that the signatures to the certificates in question were not the genuine signatures of Van Winkle. It was to this ruling that the fourth exception was taken.

It is thought that this ruling of the Court below was erroneous, because the witness was without competent knowledge to enable him to testify, and that to allow him to give his opinion or declare his belief as to the genuineness of the signatures, under the circumstances, was nothing more nor less than allowing a comparison of hand-writing on separate papers, as medium of proof, which, by the law of this State, it is supposed, is forbidden. In this position, however, I do not agree. In the first place, I am of opinion that the witness had competent knowledge to enable him to declare his belief in regard to the genuineness of the hand-writing, and, in the second place, being an expert, and all the papers about which he was called to speak being in evidence, and there being no question or controversy in regard to the genuineness of the signatures in the certificate books, I am further of opinion that he was competent to testify, from a comparison of the signatures.

1. Now, according to the books, there are two modes of acquiring knowledge of the hand-writing of a party, either of which is universally admitted to be sufficient to enable a witness to testify to its genuineness. The first is from *having seen him write*, though but once, and then only to sign his name, or even his surname; and the second is, from *having seen letters or other documents*, purporting to be the hand-writing of the party, and having afterwards communicated with the writer respecting them, or where they have been acted on, or adopted in the course of business by the party, *so as to induce a*

*reasonable presumption of their being genuine.* 1 *Greenl. Ev.*, sec. 577.

Taking this latter mode as the test in the case, suppose the signatures in the certificate-book had been seen by the witness in any business transaction, or in any other way not connected with this cause, and afterwards the signatures had been fully recognized and acted upon by the writer, to the knowledge of the witness, could there be any question, in such case, but that the witness would be competent to testify as possessing knowledge of the party's hand-writing? I apprehend not. And if that be so, why and in what material respect does the case, as actually presented, differ from the case just supposed? The means of obtaining knowledge is substantially the same in both cases, and the knowledge acquired is not different in character or degree. The witness has not been assured as to the genuineness of the signatures in the books, by any act or declaration of Van Winkle, it is true; but he has been assured, in that respect, by what is in every way equivalent to the most solemn recognition of which the writer could be capable; and that is, the concession by the party against whom the evidence is offered that the writings from which knowledge is derived are genuine. The knowledge moreover has not been acquired by casually seeing the party sign his name once at some remote period, but it has been derived from deliberate inspection and scrutiny of various signatures, conceded to be genuine, to like instruments to those in dispute. And if, as was said by this Court in the case of *Smith vs. Walton,* 8 *Gill,* 83, repeating an observation of Mr. Justice WILLIAMS, in the case of *Doe vs. Suckermore,* 5 *Adol. & El.*, 703, "proof of hand-writing, from the highest degree of certainty, carrying with it perfect assurance and conviction to the lowest degree of probability, may be and is constantly submitted to the jury," it is difficult to perceive upon what reason

or principle the evidence in this case should have been rejected. As was said in the same case, knowledge derived from continued and habitual inspection or correspondence, or both, carried on till the trial itself, down to a single instance, or knowledge twenty years old, may be received. That the knowledge of the hand-writing in this case had been acquired but recently before trial, and during the pendency of the cause, ought not, surely, to be taken as a valid objection to the reception of the evidence. Take the case, by way of illustration, put by Mr. Justice WILLAMS in the case of *Doe vs. Suckermore:* "Suppose a person to have seen another sign or write a paper, or to have received one or more letters from him, but, from length of time, his general recollection was become so faint and indistinct that he should be unable to form an opinion, might he not," asked the learned Judge, "peruse and study those authentic documents, if in his possession, to improve and refresh his knowledge before he was called upon to give evidence respecting the writing of that person, by whom such paper or letters, as above supposed, were confessedly written? I apprehend he certainly might. Up to the extent of these observations," he continues, "if not beyond them, the very point has been decided in the case of *Burr vs. Harper, Holt, N. P.,* 420. In truth the reference was made, in that case, not to revive and refresh, but to gain knowledge. And would such perusal be admissible if made a week or a month before the trial, but not so if made an hour before the witness went into Court to give his opinion upon the particular writing in question?" I think, therefore, no such distinction can or ought to be made; and if the witness can inspect a writing admitted to be genuine for the purpose of reviving and refreshing an insufficient or worn out impression in his mind, as he doubtlessly can, (8 *Gill,* 85,) it is altogether beyond my comprehension why he cannot be allowed to examine

the same genuine paper for the purpose of acquiring original knowledge of the party's hand-writing.

It is for these reasons that I am of opinion that the witness possessed competent knowledge to enable him to testify with respect to the signatures in dispute.

2. Then, as to the competency of the witness to testify simply as an expert, Mr. Greenleaf, in his work on Evidence, sec. 578, says, that the rule, requiring personal knowledge on the part of the witness, has been *relaxed in two cases:*

1. Where writings are of such antiquity, that living witnesses cannot be had, and yet are not so old as to prove themselves. Here the course is to produce other documents, either admitted to be genuine or proved to have been respected and treated and acted upon as such by all parties ; and to call *experts* to compare them, and · to testify their opinion concerning the genuineness of the instrument in question. For this are cited several authorities both English and American.

2. Where *other writings*, admitted to be genuine, are *already in the case.* Here, says the author, the comparison may be made by the jury, with or without the aid of experts. And this Court, in the case of *Williams vs. Drexel*, 14 *Md.*, 566, decided that where a paper, which is admitted or clearly proved to be genuine, is already in the cause, and another paper, pertinent to the issue, alleged to be in the same hand-writing, is offered in evidence, the jury may compare the latter with the former ; and the section of *Greenl. Ev.*, to which I have referred, was cited and relied on by the Court. The question whether an expert would have been allowed to give testimony in that case, as an aid to the jury, was not presented ; but nothing was said or intimated against the admissibility of such testimony in a proper case. And cases are not wanting in which experts have been allowed to testify, whether the writing in question was in a real or a

feigned hand, and to compare it with other writings already in evidence, as in this case. As instances of this, see the cases of *Revett vs. Braham*, 4 *T. Rep.*, 497; *Hammond's Case*, 2 *Greenl.*, 33; *Moody vs. Rowell*, 17 *Pick.*, 490; *Lyon vs. Lymam*, 9 *Conn.*, 55.

*Mr. Phillips*, 2 *vol.*, *Ev.*, 254, referring to the rule upon this subject, says: "The evidence of a witness, who, from habit and practice, has acquired experience and skill in judging of the genuineness of hand-writing, and who states his belief that a particular writing is in an imitative style and forged, appears to be strictly admissible, although he is not acquainted with the hand-writing supposed to be imitated." This character of evidence was admitted in the case of *Doe vs. Suckermore*, 2 *Nev. & P.*, 16; 2 *Phil. Ev.*, 261.

It must be borne in mind that this is not the case like *Doe vs. Suckermore*, 5 *Adol. & El.*, 703, (in which the Judges were equally divided in opinion on the admissibility of the evidence,) where papers, irrelevant to the record, are attempted to be introduced for the sole purpose of creating a standard of comparison; but is the case, where all the papers to which the witness refers, are properly in evidence for other purposes. Hence, the objections generally urged against the comparison of hand-writing, as medium of proof, that it may give rise to fraud in the selection of the writings as specimens to be used, and to collateral issues as to the genuineness of the specimens produced, cannot apply.

I am therefore of opinion that it was proper that the witness should have been allowed to testify as an expert in respect to the signatures in evidence before the jury.

Having thus disposed of the question of evidence, I come now to consider the law arising upon such of the prayers acted upon by the Court below, as have been made ground of exception by the plaintiff. And as these prayers all have reference to the acts and conduct, and

extent of authority of Crawford, the treasurer and transfer agent of the defendant, it is well, before referring particularly to the prayers, to ascertain what express authority was delegated to this agent by the defendant.

Crawford was duly appointed treasurer of the defendant, and which office he held at the pleasure of the board of directors. By the by-laws of the defendant, it was declared that "the duty of the treasurer, in addition to the usual functions of such an officer, shall be to keep the ledger and other books, relating exclusively to the ownership and transfer of the capital stock of the company, to prepare and countersign all certificates of ownership of stock and scrip hereafter issued, and to receive and enter upon the proper book, all transfers thereof. He shall affix an impression of the seal of the company to all certificates of ownership of stock and scrip properly issued by the company, and signed by the president, and also to such other instruments and papers as are required by law, or the by-laws of the company, or may be directed by the board to be under seal." He was required by the same by-law to give bond, and until further directed, to keep his office in the city of Baltimore. This by-law was in force during the period that Crawford held the office of treasurer and transfer agent of the company.

The fact that the plaintiff is a *bonâ fide* holder for value of the certificates of stock in question, and that he had no reason to suspect, at the time he received them, that they were fraudulently or improperly issued, is not controverted; but the real question is, to what extent is the company liable in respect of these certificates, for the fraudulent acts of its transfer agent.

The several prayers on the part of the plaintiff, to the refusal of which exception was taken, present the right to recover on two distinct grounds:

1st. On the hypothesis that the several certificates of stock had been signed by the president, Van Winkle,

and that they were in all respects in the usual form of genuine stock certificates, and that they were issued by the transfer agent at his office, while engaged in the business of his employment; and,

2ndly. That, assuming or conceding the signatures of the president, Van Winkle, to the certificates of stock not to be genuine, inasmuch as the certificates were issued from the company's office, by its regular officer, in the usual form, without notice of any defect or irregularity therein by the plaintiff, the circumstances under which the certificates were issued preclude and estop the defendant from availing itself of the fraud of the transfer agent, and the want of the genuine signatures of the president to the certificates, as a defence to the action.

Under the first of these propositions are embraced the first and seventh prayers of the plaintiff, and under the second, are embraced the second, third, fourth and sixth prayers.

Those of the defendant's prayers which were granted by the Court, will be disposed of in the result of the legal propositions involved in the prayers of the plaintiff.

1. And first, as to the first and seventh prayers of the plaintiff. These prayers maintain, that if the signatures of the president to the certificates be genuine, the fraud of the transfer agent in issuing the certificates for his own purpose, and not that of the company, under the facts stated, the plaintiff being innocent, does not affect the right of the latter to recover. And of this I think there should be no question.

The general doctrine is too well established to be questioned, that the principal is liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances, or misfeasances, and omissions of duty of his agent, *in the course of his employment*, although the principal did

not authorize or justify, or participate in, or know of such misconduct, or even if he forbade the acts, or disapproved of them. *Sto. Ag.*, sec. 152, *and the authorities cited.* And it is equally well settled that corporations are liable for the acts and conduct of their agents, while engaged in the business of their employment, in the same manner and to the same extent that individuals are liable, under like circumstances. *Ranger vs. The Great West Railroad Co.*, 5 *Ho. L. Cas.*, 86; *Merchants' Bank vs. State Bank*, 10 *Wall.*, 604.

The question of liability here, however, raised on these prayers, involving the fraud of the agent, depends, not upon the actual authority, but upon the *apparent authority*, of the agent, in the exercise of his employment. The rule upon this subject is stated by Lord ELLEN-BOROUGH, in *Pickering vs. Busk*, 14 *East*, 43, as clearly, and, at the same time, as broadly as can be found in any of the authorities. He there lays it down as clear law, that strangers can only be required to look to the acts of the parties, and to the external *indicia* of property, and not to the private communications which may pass between a principal and his agent; and if a person authorize another to assume the *apparent right* of disposing of property in the ordinary course of trade, it must be presumed *that the apparent authority is the real authority*. That the agent may bind his principal within the limits of the authority with which he has been *apparently* clothed in respect to the subject-matter; for otherwise there would be no safety in mercantile transactions in which agents are employed. The same doctrine, though stated in somewhat different terms, has been declared by this Court, in the case of *Lister and Supplee vs. Allen*, 31 *Md.*, 543.

Now, such being the law, if it be true that the certificates of stock were signed by the president, and were, in all other respects, regular on their face, and were

issued by the transfer agent at the company's office, in the apparent exercise of his employment, and the plaintiff became the *bonâ fide* possessor of them, under the circumstances stated in the prayers, why should the company not be responsible? It claims to be exonerated upon the ground that the agent transcended his authority in issuing the stock, and because he used it for his own purposes, and thus perpetrated a fraud upon the company. But if there was apparent authority, the fact that the agent used the stock for his own purposes, and thus committed a fraud, will not justify the company in repudiating the stock as spurious, and by that means throw the loss occasioned by the fraud of their agent upon an innocent third party. These certificates having all the *indicia* of genuineness, and coming from the proper office and officer to furnish them, third parties accepting them were not bound to enquire as to the circumstances under which they had been signed by the president, or in what manner or for what purpose they had been left with the transfer agent. It was enough, so far as *bonâ fide* third parties were concerned, that the certificates were issued by an officer with apparent authority in the premises. That this transfer agent had such authority is manifest. By the by-law, before referred to, he was clothed with express authority, and it was made his duty to keep the books relating to the ownership and transfer of the capital stock of the company; to prepare and countersign all certificates of ownership of stock and scrip that might be issued, and to receive and enter upon the proper books all transfers thereof. It was made his duty, moreover, to affix the seal of the company to all certificates of stock. With these powers and duties, pertaining to the issuing of certificates and transfer of stock, what could third parties or the public conclude in reference to the want of authority in the agent, in the absence of some admonition of the circumstances under

which the certificates were signed by the president and left in the custody of the transfer agent? Every person dealing in the usual and ordinary course, had a right to presume that the certificates signed by the president were properly in the custody of the transfer agent, and that they were intended to be used as the agent did use them. The public could deal upon no other presumption. The certificates were genuine, according to the assumption of these prayers, and such as were issued in the most regular transaction; but the fraud of the agent consisted in the improper and illegal purpose for which they were issued. The consequences of this fraud should be borne by the company, employing and entrusting the agent, rather than an innocent third party, dealing upon the faith of appearances that the company must be taken to have allowed to exist. Such would seem to be the result of all the authorities upon the subject.

The case of *Adams Express Co. vs. Trego*, 35 *Md.*, 47, was much relied on by the defendant's counsel as maintaining principles that would exonerate the defendant from liability for the acts of its agent, under the circumstances of this case; but that case is quite distinguishable from this. There the main question was, whether the act of the superintendent was within the limit and scope of his authority; and this Court, under the particular facts of the case, decided that it was not, and that the Express Company was not bound therefor.

It follows, from what I have said, that I am of opinion that there was error committed by the Court below in refusing to grant the first and seventh prayers of the plaintiff; and for the same reasons that I think these prayers should have been granted, I am of opinion that the first, second, third and seventh prayers of the defendant should have been refused. The fact relied on in the second and third of the defendant's prayers, that the certificates of stock were pledged to the plaintiff as col-

lateral security for the loan of money to a broker for the benefit of the fraudulent agent, can make no difference if the plaintiff acted *bonâ fide* in loaning his money on the faith of the certificates. For the principle would seem to be well settled, that, in the case of a pledge of certificates of stock, which pass by delivery, or where they are issued in, or transferred to, the name of the pledgee, if the pledgor has been, by the act or conduct of the real owner, clothed with the apparent title to, or seeming rightful control over the stock, without the disclosure of any circumstances to indicate the want of authority to dispose of it, the pledgee, if a *bonâ fide* holder without notice, may hold the stock against the claim of the real owner. *Lowry vs. Com. & Farmers' Bank, Campb. C. C. Rep.*, 310; *Jarvis vs. Rogers*, 13 *Mass.*, 105; *Wilson vs. Little*, 2 *Comst.*, 443; *The Queen vs. The Shropshire Union Co.*, *Law Rep.*, 8 *Q. B.*, 420, *in Exch. Chamber; Sto. on Bailm.*, sec. 322. And this case clearly comes within the principle; for the plaintiff, if acting *bonâ fide*, had a right to conclude that the ownership of the stock was either in the broker or the party for whom the money was loaned.

2. I come now to the second, third, fourth and sixth prayers of the plaintiff, and they present questions quite different from those just considered.

These prayers proceed upon the theory of the defendant's liability, notwithstanding the president's signatures to the several certificates of stock were not genuine, or had been forged by the transfer agent. Under the second and third prayers it is insisted that, as the certificates have all the other *indicia* of genuineness, and were issued from the company's office, and by its agent, apparently in the exercise of his employment, and who was entrusted with the regular blanks, and with the seal of the corporation, the defendant is estopped by the acts and conduct of the agent; and, under the fourth and sixth

prayers, in connection with, and addition to, the facts enumerated in the preceding second and third prayers, the negligence on the part of the directors of the company, in not supervising and investigating the affairs of the office and conduct of the transfer agent, is relied on as ground of estoppel to the defendant from showing the certificates not to be valid for want of the genuine signatures of the president.

Now, assuming throughout that the issuing of the several certificates were not corporate acts, and were not. in any manner assented to by those capable of binding the corporation, the question is, are the facts enumerated in these prayers of the plaintiff of a character and sufficient to operate an *estoppel in pais?* for if not, the general principle is applicable, that no title can be acquired by or through the means of a forgery.

That the certificates were not valid without the signature of the president, has not been and could not be denied. Indeed, by invoking the doctrine of estoppel the invalidity of the certificates is conceded ; for an *estoppel in pais* presupposes an error or a fault, and implies an act in itself invalid. It proceeds upon the principle that the author of the misfortune shall not himself escape the con· sequences and cast the burden upon another more innocent than himself. 10 *Wall.*, 645.

On these prayers the first question is, what acts or representations of the transfer agent will bind the company by way of an estoppel? Judge STORY states it as unquestionable law, "that no representations, declarations or admissions of an agent will bind his principal, except in cases *within the scope of the authority confided to him.*" *Sto. Ag., sec.* 134. This authority, it is true, may be by express delegation, or by implication, arising from the appearance of things recognized, or allowed to exist with the knowledge of the principal.

Here it is insisted, notwithstanding the signature of the president to the certificates of stock may not be gen-

uine, but be forged, that under the circumstances stated, the defendant is bound, by the representation of the validity and genuineness of the certificates of stock, made by the act of its transfer agent, and is, therefore, estopped from denying the validity and genuineness thereof. In this proposition is asserted the principle that, although the certificates were invalid without the genuine signature of the president, yet all the purposes of that signature, as means of authentication, could be supplied, and the company bound, by the simple false representation of the transfer agent, by the act of issuing the certificates of stock from the regular office of the company under its seal, that the certificates were proper corporate acts, and had been duly signed by the president, according to their purport.

Now it must be borne in mind, that the office and agency of the president is quite distinct from that of the treasurer and transfer agent; and that the latter has no power or authority to exercise the functions of the former. The object of requiring both of these agents to officiate in issuing and authenticating certificates of stock, was to establish checks to operate as a protection, not only to the company but to the public. The certificates themselves purport on their face to be issued by the separate and distinct acts of the two agents; and it is conceded that they should so purport to give them validity. How then can the one agent by act or false representation supply or dispense with the office of the other? His acts and representations made in this respect are clearly not within the scope of his own authority, but within that delegated to another; and as the validity of the certificates required the exercise of the functions of the two agents, the representations of the one, whether by word or act, with respect to the exercise of the separate power or authority of the other, not being within (but extrinsic,) the authority confided to him, do not bind the principal. Any

other doctrine would go far to destroy and render nugatory all checks that corporations may have devised for the protection of their stock. For if the representation of the transfer agent in respect to the signature of the president, is to conclude the corporation, then his representations as to the genuineness of the seal, and every other act of authentication, although they may all, in the particular instance, be false and counterfeit, must equally conclude; and hence, while corporations are bound to act through such agencies, they may be unable, by any checks or precautions that they can adopt, to protect their stockholders against the forgeries and counterfeits of their agents. To such an extent, I am sure, no well considered case has yet gone.

The well established doctrine, that the representations of the agent do not bind the principal, unless made within the scope of his authority, finds apt illustration in decided cases.

In the case of *Grant vs. Norway*, 2 *Eng. L. and Eq. Rep.*, 337, it was held that the master of a ship, though a general agent, to perform all things relating to the usual employment of the ship, had no authority as such, to sign a bill of lading for goods which were not put on board the vessel; and consequently the owners of the ship were not responsible to innocent third parties, who had advanced money and incurred liability on the faith of a bill of lading which had been signed by the master without receiving the goods on board. In the course of the opinion of the Court, delivered by Chief Justice JARVIS, he said: "The master is a general agent to perform all things relating to the usual employment of his ship, and his authority as such agent to perform all such things as are necessary in the line of business in which he is employed, cannot be limited by any private orders not known to the party in any way dealing with him. This general proposition is laid down by Mr. Smith in

his Mercantile Law, p. 559. Is it then, usual, in the management of a ship carrying goods on freight, for the master to give a bill of lading for goods not put on board? All parties concerned have a right to assume that the agent has authority to do all that is necessary, but the very nature of the bill of lading shows that it ought not to be signed till the goods are on board, for it begins by describing them as 'shipped.'"

In that case, the representation was that the goods had been shipped, which was false; in this, the representation relied on as concluding the company is, that the certificates were genuine and valid, when they were not so. The principle of the case of *Grant vs. Norway*, was followed and fully sanctioned in the cases of *Hubbersty vs. Ward*, 8 *Exch.*, 330, and *Coleman vs. Riches*, 29 *Eng. L. & Eq. Rep.*, 323.

The act or representation of the transfer agent in issuing the certificates not being ground of estoppel, in respect to the validity of the stock, the next element relied on by the plaintiff to fix responsibility on the defendant is that of negligence in the officers and directors of the company, whereby, as it is alleged, the transfer agent was enabled to perpetrate the fraud by the issue of the spurious stock with the forged signatures of the president to the certificates.

Now, in order to make such negligent conduct effective for the purpose here intended, it must be shown to be of a character that amounts to an estoppel, or something that amounts to an implied ratification. Mere negligence, remotely connected with the forgery, or the issue of the spurious stock, will not render the defendant liable. The negligence which would deprive the defendant of its right to insist that the certificates were spurious and therefore invalid, must have been negligence in, or immediately connected with, the issue of the certificates themselves. This is decided, and well and fully illustrated in the case

of the *Bank of Ireland vs. Evans' Trustees,* 5 *Ho. L. Cas.,* 389. There, the trustees of an incorporated charity, having a common seal, and being possessed of stock in the public funds, which was registered in the Bank of Ireland, allowed their seal to be in the custody of their secretary, who, without any authority, affixed it to five powers of attorney, prepared in different years, and signed by the trustees. The affixing of the seal was attested by a witness, who had never in fact seen it affixed, but without any fraudulent intent in so doing. The secretary presented the powers of attorney to the bank, and obtained the stock. And in an action by the trustees against the bank, for refusing to transfer the stock under a valid power of attorney, the Chief Justice in Ireland instructed the jury, that if they believed that the five powers of attorney were forgeries, then the verdict ought to be for the plaintiffs, unless they at the same time believed that the use made of the common seal of the trustees, whereby the defendants were imposed upon, was caused exclusively by the negligence or default of the plaintiffs, in which case the verdict should be for the defendants. On exception, this direction was held to be erroneous; and on the case coming into the House of Lords on writ of error, the Judges of England were required to attend the argument and give their opinion upon the case. And Mr. Baron PARKE, in delivering the unanimous opinion of the Judges, said: "We concur with Mr. Justice JACKSON, and Justices BALL, CROMPTON and TORRENS, and the Chief Justice LEFROY, in thinking that the negligence which would deprive the plaintiff of his right to insist that the transfer was invalid, must be negligence in, or immediately connected with, the transfer itself." And after referring to *Young vs. Grote,* 4 *Bing.,* 253, the case of the altered cheque, he proceeded to say: "If there was negligence in the custody of the seal, it was very remotely connected with the

act of transfer.   The transfer was not the necessary or
ordinary, or likely result of that negligence.   It never
would have been but for the occurrence of a very extra-
ordinary event, that persons should be found, either so
dishonest or so careless as to testify on the face of the
instrument, that they had seen the seal duly affixed.  It
is quite impossible that the bankers could have main-
tained an action for the negligence of the trustees, and
recover the damages they had sustained by reason of their
having made the transfer.   If such negligence could dis-
entitle the plaintiffs, to what extent is it to go?   If a
man should lose his cheque-book, or neglect to lock the
desk in which it is kept, and a servant or stranger should
take it up, it is impossible in our opinion to contend that
a banker paying his forged cheque would be entitled to
charge his customer with that payment.   Would it be
contended that if he kept his goods so negligently that a
servant took them and sold them, he must be considered
as having concurred in the sale, and so be disentitled to
sue for their conversion on demand and refusal?   It is
clear, we think, that the negligence in the present case,
if there be any, is much too remote to affect the transfer
itself, and to cause the trustees to be parties to mislead-
ing the bank in making the transfers on the forged powers
of attorney."   In this opinion, the LORD CHANCELLOR and
Lord BROUGHAM fully concurred, and the case was ruled
accordingly.

In the case before us the facts are not stronger to raise
an estoppel than were the facts in the case just referred
to.   There the secretary was not only allowed to have
the custody of the seal, but access to powers of attorney
ready signed by the trustees.   Here it was made the duty
of the treasurer and transfer agent to keep the books for
the registration and transfer of stock, and he was allowed
access to the seal, which it was his duty to use on proper
occasions, and he was furnished with books of blank cer-

tificates. It does not appear that there was anything very unusual or extraordinary in this; and although it may be regarded as incautious or negligent thus to have confided in the transfer agent, it cannot be contended that the issue of false and forged certificates of stock was the necessary, or ordinary, or likely result of such negligence. There is no pretence that there was any fraudulent connivance on the part of the president and directors of the company, at the improper use of the facilities thus afforded the transfer agent for the issue and transfer of stock; and it certainly cannot be regarded as such negligence in them as to render the company responsible, that they did not contemplate and render impossible the commission of forgery and fraud by their agent. Principals are not required, by any rule of law or justice, to act in reference to their agents upon the presumption that the latter will avail themselves of any opportunity or facility to commit felonies or crimes of any sort. There is no such criterion of responsibility.

The other facts relied on, that the president and directors failed to hold regular meetings, and to investigate the books and transactions of the agent, but acted upon the supposition that all was right at their office, may show that those officers were negligent in the discharge of their duty, but such negligence was not sufficiently proximate and connected with the issue of the forged certificates of stock in this case, to render the company liable.

In the case of *Swan vs. The North British Australasian Co.*, 2 *Hurls. & Colt.*, 175, *in the Exchequer Chamber*, (*S. C.*, 7 *Hurls. & N.*, 603, *and* 7 *C. B.*, 400,) where a transfer of stock was procured by an agent of the owner, by means of a forged deed, and where the circumstances of negligence on the part of the owner of the stock in facilitating the forgery, would appear to have been even stronger than those in the case of *The Bank of Ireland*

*vs. Evans' Trustees*, the doctrine of the latter case was fully adopted after a most thorough consideration ; and it was held:

1. That negligence to operate as an estoppel in such case, must be the proximate cause of the loss ; and,

2. That the transfers involved in that case were void, and that there was no such negligence on the part of the plaintiff suing the company for refusing to restore him to the rights of ownership of the stock, as would estop him from insisting that the property in the shares did not pass under the transfers procured by means of the forgery. The doctrine of these cases is not only applicable, but would seem to be conclusive of the question here involved.

The case of the *New York and New Haven Railroad Company vs. Schuyler, et al.,* 34 *New York Rep.,* 30, has been much relied on by the plaintiff, as an authority for the support of the propositions involved in the prayers under consideration. But the question of forgery was not involved in that case. That was an application in the nature of a bill in equity against Schuyler and others, to have a large number of alleged false and fraudulent certificates and transfers of pretended stock of the company made by Schuyler, and charged to be held by the defendants, adjudged spurious and void, and to compel the certificates to be brought into Court to be cancelled. It was the case of a fraudulent over-issue of stock. Schuyler was the president, and one of the directors of the company, and was, besides, transfer agent. It appeared that the board of directors had transferred to this agent all their powers in respect to the transfer of stock at the New York agency. They furnished him with blank transfers, certificates, assignments and powers, bound in books, the stock ledger and other account books, and gave into his absolute control the keeping and management of such books, and the employment

8                          v. 39.

and control of the clerical force necessary to that purpose. For more than seven years they left to him the unchecked and unquestioned management of the entire business of the transfer office; and it was by no means limited to the mere duty of permitting transfers and issuing certificates upon transfers. He was allowed to dispose of parcels of the stock on account of the company; and a very large amount of the stock was issued and disposed of on his own account, and for his own purposes. And in view of the great extent of the authority with which Schuyler was clothed by the company, either by direct appointment, or by recognition and ratification, or by actual enjoyment of the fruits of his acts, or by long acquiescence from which a presumption of agency could arise, the Court of Appeals of New York might well conclude, as they did, that the issuing of the certificates by such agent was within the scope of the real and apparent authority which he possessed, and that the rights of third parties were not affected by the fact that the agent used and intended to use the proceeds of the stock for his own purpose. This is the leading proposition decided by the case; and while the case furnishes very good authority in support of the first and seventh prayers of the plaintiff, it has little or no direct application to any of his other prayers. The doctrine of estoppel *in pais* is discussed, it is true, but with reference to a very different state of facts from that presented in this case.

With these views, I am of opinion that the Court below committed no error in refusing to grant as instructions the second, third, fourth and sixth prayers of the plaintiff. But I think the fourth and fifth prayers of the defendant, which were intended to present converse propositions to those presented by the second, third, fourth and sixth prayers of the plaintiff, should have been refused. They are too abstract in form, and seem

to assume, as a principle, that no degree of negligence on the part of the president and directors of the company, however proximate to the issue of the false and spurious certificates, could operate as an estoppel upon, or an implied ratification by, the defendant. No such proposition as that is intended to be maintained by anything said in this opinion, and I am quite sure it is not maintainable upon authority.

For the reasons I have stated, I am of opinion that the judgment of the Court below should be reversed, and a new trial awarded.

I am authorized by Chief Judge BARTOL to say that he concurs with me in the foregoing opinion.